T.C. Memo. 2002-34

UNITED STATES TAX COURT

ESTATE OF RICHIE C. HECK, DECEASED,
GARY HECK, SPECIAL ADMINISTRATOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11619-99.          Filed February 5, 2002.

Decedent owned 630 shares of F. Korbel & Bros.,
Inc. stock representing a 39.62-percent ownership
interest in the corporation.
<u>Held</u>: Fair market value of the shares determined.
Sec. 2031, I.R.C.

<u>Richard J. Sideman</u>, <u>Steven M. Katz</u>, and <u>George I. Hoffman</u>,
for petitioner.

<u>Marion T. Robus</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By notice of deficiency dated April 16, 1999, respondent determined a deficiency in Federal estate tax of $5,427,983.  Of the adjustments giving rise to that determination, the only one remaining in dispute is respondent's increase in the value of certain shares of stock included in the gross estate.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts are stipulated and are so found.  The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

Introduction

Richie C. Heck (decedent) died on February 15, 1995 (the date of death or the valuation date).  Gary Heck (sometimes, petitioner) is the special administrator of decedent's estate. At the time of the petition, petitioner resided in Santa Rosa, California.  Among the assets includable in decedent's gross estate are 630 shares of stock (the shares), representing 39.62 percent, of the outstanding common stock of F. Korbel & Bros., Inc. (Korbel), a California corporation.  Petitioner

timely filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (the estate tax return) on May 15, 1996. Petitioner did not elect alternate valuation. See sec. 2032. In the estate tax return, petitioner valued the shares at $16,380,000, or $26,000 a share. In determining a deficiency in estate tax, respondent valued the shares at $30,177,000, or $47,900 a share.

Organization and Operation of Korbel

Korbel was formed in 1903. Its business began in 1860, when three Korbel brothers purchased property in Guerneville, California, for the logging of timber. A decade later, vinifera grapes were planted on the property, and, in 1882, the first bottle of champagne was produced. Korbel has produced champagne on the property, utilizing the traditional "methode champenoise",[1] ever since.

---

[1] Champagne or sparkling wine (although the name "champagne", technically, refers to sparkling wine produced in the Champagne region of France, the terms "champagne" and "sparkling wine" are often used interchangeably, and are so used herein) is, in essence, wine that has been subject to a second fermentation. Premium brands, such as Korbel, utilize the French "methode champenoise", pursuant to which the second fermentation and all subsequent steps such as the removal of impurities and the addition of flavoring components take place while the champagne is in the bottle that is ultimately sold to the public. That method is much more expensive and is considered far superior to methods, such as the "Charmat process" or the "transfer method", pursuant to which certain steps do not take place in the bottle.

The Heck family purchased control of Korbel in 1954, and, in 1976, Adolf Heck (decedent's husband) became the sole shareholder of the 1,900 shares of common stock outstanding. As of 1984, Adolf and decedent each owned 950 shares. In 1984, Gary Heck acquired 380 shares (190 each from Adolf and decedent). Also, in 1984, Adolf died, Korbel redeemed 310 of his remaining 760 shares from his estate, and the remaining 450 shares passed in trust for decedent's benefit. In or around 1987, Gary Heck purchased the 450 of the shares in trust, giving him 830 shares (52.2 percent of the 1,590 shares outstanding) and leaving decedent with the remaining 760 shares. In 1989, decedent transferred 130 shares in trust for the benefit of her two grandchildren. That left decedent with 630 shares, the value of which, on the date of death, is in dispute herein.

Primarily, Korbel produces economically priced premium champagne. During the 3-year period ending with 1994, champagne sales represented approximately 70 percent of Korbel's total sales, brandy represented approximately 27 percent of such sales, and still wine accounted for the approximately 3-percent balance. At the beginning of 1995, 95 percent of Korbel's gross profits were attributable to sales of champagne and just under 5 percent to sales of brandy.

As of the valuation date, Korbel's facilities were located on 1,800 acres of land, mostly in Sonoma County. Of that

acreage, 1,099 acres were not used in Korbel's business activities, and, on the valuation date, such land had a value of $2,000 an acre.

In January 1986, Korbel elected to become an S corporation (within the meaning of section 1361(a)(1)). That election was in effect on the valuation date. Korbel's financial statements and tax returns are prepared on a calendar-year basis.

Distribution Agreement Between Korbel and Brown-Forman Corp.

In 1965, Korbel signed a marketing agreement with Jack Daniel Distillery, Lem Motlow, Prop., Inc. (Jack Daniel), granting Jack Daniel worldwide rights to buy, sell, and distribute all Korbel beverage products. Thereafter, Jack Daniel was consolidated into Brown-Forman Corp. (Brown-Forman), and, in 1987, Brown-Forman contracted to be the exclusive distributor of Korbel products.

In 1991, Korbel and Brown-Forman entered into a new distribution agreement (the agreement or the Brown-Forman agreement), effective through April 30, 2003, automatically renewable on a year-to-year basis thereafter, and cancelable on or after May 1, 1998, upon 5 years' written notice by either party to the other of its intent to cancel. The agreement granted to Brown-Forman the U.S. distribution rights for Korbel's champagne and brandy products, except for Korbel's right to sell through its on-premises wine shop. The agreement was amended in

October 1994 to grant Brown-Forman worldwide distribution rights.

In addition to dealing with the distribution of Korbel's products, the agreement grants to Brown-Forman a right of first refusal with respect to offers of Korbel's stock by family members. In that respect, the agreement provides:

> RIGHT OF FIRST REFUSAL. In the event any member of the Heck family desires to sell his or her shares of stock in KORBEL to a person who is not a lineal descendant of ADOLF L. HECK, he or she shall notify BROWN-FORMAN, in writing, giving the name of the prospective purchaser, a copy of the offer to purchase, the number of shares and the price per share. BROWN-FORMAN shall have thirty (30) days from receipt of such notice to elect to purchase and pay for the said stock at the price stated for cash. If BROWN-FORMAN does not purchase such stock within said 30 day period, it may be sold to the stated person at the stated price without any further obligation to BROWN-FORMAN, meaning that BROWN-FORMAN shall not have any further right to purchase any of the KORBEL stock sold. If KORBEL has a prospective purchaser for 50% or more of KORBEL stock who is not a lineal descendant of ADOLF L. HECK and BROWN-FORMAN does not exercise its prior right to purchase said stock, then BROWN-FORMAN shall have no further first right of refusal to buy that stock of KORBEL at any time. * * *

Financial Performance

From 1985 through 1994, Korbel's sales and net income were as follows:

| Year | Revenues | Net Income |
|------|----------|------------|
| 1986 | $76,955,000 | $17,527,000 |
| 1987 | 85,582,000 | 25,317,000 |
| 1988 | 86,920,000 | 20,177,000 |
| 1989 | 79,294,000 | 12,728,000 |
| 1990 | 78,646,000 | 11,961,000 |
| 1991 | 75,677,000 | 7,735,000 |
| 1992 | 77,551,000 | 6,720,000 |
| 1993 | 78,569,000 | 7,179,000 |
| 1994 | 82,758,000 | 11,955,000 |

As of December 31, 1994, Korbel's audited balance sheet showed assets valued at $83,985,000, liabilities of $10,115,000 (current liabilities of $5,456,000 and long-term obligations of $4,659,000), and shareholder equity of $73,870,000. Among Korbel's assets was a $2,209,000 interest-bearing note receivable from KFTY Broadcasting (KFTY), a company owned by Gary Heck.

In 1994, although sales of Charmat process and transfer method brands declined 11 percent, sales by domestic methode champenoise producers increased by 4 percent. Korbel's sales of champagne increased by 6 percent in 1994. That year, although Korbel was responsible for only 8.8 percent of total sales of champagne in the United States, it represented 47.6 percent of the domestic market for champagne produced by the methode champenoise.

Respondent's Expert

Respondent offered Herbert T. Spiro, Ph.D. (Dr. Spiro), as an expert witness, to testify concerning the valuation of closely held companies. Dr. Spiro is president of the American Valuation Group, Inc. (AVG), and has directed and conducted valuation studies of various types of business enterprises. The Court accepted Dr. Spiro as an expert in the valuation of closely held companies and received written reports of AVG into evidence as Dr. Spiro's direct testimony and his rebuttal testimony,

respectively. In his direct testimony, Dr. Spiro reached the conclusion that the aggregate fair market value of the shares as of the valuation date was $30,300,000, or $48,100 a share, rounded.[2]

In reaching his conclusion, Dr. Spiro utilized both a market approach and an income approach, the latter of which is based upon the discounted cashflow method. He then applied to the results under both approaches a 15-percent "liquidity discount" and a 10-percent discount for "additional risks associated with S corporations" including "the potential loss of S corporation status and shareholder liability for income taxes on S corporation income, regardless of the level of distributions." He reconciled the two approaches by applying a 70-percent weighting factor to the "indicated value" of each share under the income approach ($36,150) and a 30-percent weighting factor to such value under the market approach ($65,209), resulting in a

---

[2] The AVG report that constitutes Dr. Spiro's direct testimony is dated Apr. 26, 2000. The parties have stipulated, and we have received into evidence, an earlier report from AVG to respondent, dated Oct. 3, 1997, in which AVG concludes that the fair market value of the shares on the valuation date was $30,177,000. That value agrees with the value used by respondent in preparing the notice of deficiency here in issue, but it is lower than the value reached in the Apr. 26, 2000, report. On brief, respondent asks us to find that, on the valuation date, the fair market value of the shares was $30,177,000. We conclude that respondent is not asking for any increased deficiency, even though the report that constitutes Dr. Spiro's direct testimony finds a slightly higher valuation of the shares.

"weighted" share value of $44,868. He explained that "[t]he market approach is weighted less at 30 percent due to the lack of perfect comparables". Lastly, he adjusted that value upward to account for certain nonoperating assets: 1,099 acres of so-called excess land with a stipulated value of $2,000 an acre (total value: $2,198,000) and $5.25 million of "excess cash". Before making that upward adjustment, however, he applied certain discounts. He applied a 25-percent "minority" discount and, sequentially, the above mentioned 25-percent "liquidity" discount to the stipulated value of the land, reducing such stipulated value to $1,236,375, or $778 a share. He applied the additional 25-percent "minority" discount in recognition of the fact that the land value "cannot be readily realized by the minority shareholder." He applied the same 25-percent minority discount (but not the liquidity discount) to the so-called excess cash, resulting in a value of $3,939,000, or $2,477 a share. He derived his share value for Korbel of $48,123 ($48,100 rounded) and total value of decedent's 630 shares (rounded) of $30,300,000 after making the aforesaid adjustments to the value of the nonoperating assets.

Petitioner's Expert

Petitioner offered Mukesh Bajaj, Ph.D (Dr. Bajaj), as an expert witness, to testify concerning the valuation of closely held companies. Dr. Bajaj is a managing director, finance and

damages practice, of LECG, Inc. Dr. Bajaj has experience as a university professor of finance and business economics, he has lectured on valuation issues, and he has performed business valuations for purposes of litigation. The Court accepted Dr. Bajaj as an expert in the valuation of closely held companies and received his written reports into evidence as his direct and rebuttal testimony, respectively. In his direct testimony, Dr. Bajaj reached the conclusion that the aggregate fair market value of the shares as of the valuation date was $18,707,000, or $29,694 a share.

Dr. Bajaj rejected the market approach and relied exclusively upon a discounted cashflow analysis. He rejected the market approach on the ground that there were no publicly traded companies that were comparable to Korbel.

Dr. Bajaj's discounted cashflow analysis resulted in a net operating asset value for Korbel of $72,041,711. To that amount he (like Dr. Spiro) added an additional amount for nonoperating assets: $5,517,000, consisting of $2,198,000 for the excess land, $1,110,000 representing the proceeds from insurance policies on decedent's life, and $2,209,000 for the note receivable from KFTY. He then subtracted $4,918,000 of interest-bearing debt, resulting in a fair market value for Korbel as of the valuation date of $72,640,711.

Dr. Bajaj then applied a 35-percent discount to the value derived under his discounted cashflow approach, which consisted of a 25-percent marketability discount and an additional 10-percent discount to reflect the negative impact of Brown-Forman's right of first refusal and what Dr. Bajaj refers to as "agency problems" (the inability of a purchaser of decedent's minority interest to influence dividend distributions, which would be at the discretion of the controlling shareholder, Gary Heck). Application of those discounts, totaling 35 percent, resulted in Dr. Bajaj's being of the opinion that the marketable minority value of Korbel's equity as of the valuation date was $47,216,462, resulting in a value of $18,707,162 for decedent's 630 shares, or $29,694 a share.

## OPINION

### I. Introduction

We must determine the fair market value of decedent's 630 shares of Korbel on the valuation date. The shares were included in decedent's gross estate and reported on the estate tax return at a value of $26,000 a share. Based upon the expert testimony of Dr. Bajaj, petitioner now argues that the value of each share on the valuation date was $29,694. We interpret petitioner's change in position as a concession that the estate is liable for a portion of the deficiency, and we accept that concession. In

determining the deficiency in estate tax, respondent valued the shares at $47,900 a share.

Petitioner bears the burden of proof.  Rule 142(a).

II.  Law

Section 2001(a) imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  Section 2031(a) provides:  "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."

Fair market value is the standard for determining the value of property for Federal estate tax purposes.  United States v. Cartwright, 411 U.S. 546, 550-551 (1973).  Section 20.2031-1(b), Estate Tax Regs., defines fair market value as:  "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the actual buyer or seller.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (5th Cir. 1981)).  The hypothetical willing

buyer and seller are presumed to be dedicated to achieving the maximum economic advantage, which advantage must be achieved in the context of market conditions, the constraints of the economy, and, assuming shares of stock are to be valued, the financial and business experience of the subject corporation existing on the valuation date.  Estate of Newhouse v. Commissioner, supra.

In valuing shares of stock in a corporation whose shares are not publicly traded, the factors we take into account include net worth, prospective earning power and dividend paying capacity, and other relevant factors, including the economic outlook for the particular industry, the company's position in the industry, the company's management, the degree of corporate control represented by the block of stock to be valued, and the value of publicly traded stock or securities of corporations engaged in the same or similar lines of business.  See sec. 2031(b); sec. 20.2031-2(f)(2), Estate Tax Regs.; Rev. Rul 59-60, 1959-1 C.B. 237, 238-242.

III.  Expert Opinions

A.  Introduction

In this case, the parties rely heavily, if not exclusively, on expert testimony to establish the fair market value of the shares as of the valuation date.  Indeed, respondent's only witness was Dr. Spiro.  In addition to Dr. Bajaj, petitioner called Gary Heck, decedent's son and Korbel's president and

chairman of the board, and David Faris, a Korbel assistant vice president.  Formerly, Mr. Faris was a partner in the tax department of Pisenti & Brinker, C.P.A.s.  In that role, he oversaw the preparation of Korbel's income tax returns, the estate tax return filed on behalf of decedent's estate, and the valuation, for gift tax purposes, of the stock that, in 1989, decedent transferred in trust for the benefit of her grandchildren.   Mr. Heck did not testify as to the value of the shares, and, although Mr. Faris testified that the Pisenti & Brinker gift tax valuation, in part, formed the basis for the value of the shares set forth on the estate tax return, it is the value arrived at by Dr. Bajaj, not the value on the return, that petitioner urges us to adopt.

In deciding valuation cases, courts often look to the opinions of expert witnesses.  Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, supra at 217.  Although we may accept the opinion of an expert in its entirety, see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of an expert's opinion, if any, to accept, Parker v. Commissioner, 86 T.C. 547, 562 (1986).  Finally, because valuation necessarily involves an

approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence.  Estate of True v. Commissioner, T.C. Memo. 2001-167 (citing Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285).

B.  Differences Between the Experts

The major difference between Drs. Bajaj and Spiro is their disagreement as to the propriety of utilizing a market approach (i.e., the guideline company method) in valuing the shares. Also, although both experts utilized a discounted cashflow approach in valuing the shares (Dr. Bajaj, exclusively; Dr. Spiro, in part), they disagree sharply over methodology in applying that approach.  We shall analyze the arguments presented by both experts in support of their respective positions.

IV.  Propriety of Dr. Spiro's Application of the Guideline Company Method

A.  Introduction

The guideline company method of appraisal is commonly used in valuing shares of stock in a closely held corporation.  When appropriate, its usage is mandated by section 2031(b), which provides that the value of unlisted shares of stock or securities "shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of

corporations engaged in the same or a similar line of business which are listed on an exchange."  See also sec. 20.2031-2(f), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237, 242.

The parties sharply dispute whether (1) the two guideline companies chosen by Dr. Spiro, the Robert Mondavi Corp. (Mondavi) and Canandaigua Wine Co. (Canandaigua), were comparable to Korbel for purposes of section 2031(b), (2) Dr. Spiro actually utilized only one company, Mondavi, as a guideline company, and (3) if so, the use of a single guideline company is permissible.  The parties also disagree as to the propriety of the financial ratios chosen by Dr. Spiro and his adjustments to those ratios. Petitioner also claims, and respondent denies, that Dr. Spiro's 30-percent weighting of the result of his market approach was essentially arbitrary.

B.  Dr. Spiro's Guideline Companies:  Mondavi and Canandaigua

1.  Dr. Spiro's Method

Dr. Spiro first identified 1,317 companies listed under the Standard Industrial Classification Code (SIC) 2084, wines, brandy, and brandy spirits.  Of those companies he identified only 11 that were publicly traded, and he rejected 9 of the 11 as potential comparables because, for the most part, they were either too large or diverse (or both), too small, unprofitable, or conducted business in a different manner than Korbel.

Dr. Spiro considered the remaining two companies, Mondavi and Canandaigua, comparable to Korbel.

Dr. Spiro valued Korbel's stock under the guideline company method (as of the valuation date), by reference to the 1994 fiscal yearend price to earnings (P/E) and price to operating cashflow (P/OCF) ratios for Mondavi and Canandaigua. For Mondavi, those ratios, when reduced to multiples (of earnings and OCF, respectively), were 17.51 and 9.57 and, for Canandaigua, they were 22.09 and 14.54. Dr. Spiro based Korbel's corresponding multiples on Mondavi alone, but he "adjusted" them downward, to a P/E multiple of 13 and a P/OCF multiple of 8, "to account for Korbel's additional risk factors" (i.e., the differences, discussed below, between Korbel and the guideline companies in terms of size, product mix, consumption patterns, etc.). Those derived multiples were applied, and a mean value was determined, which mean, $86,945, was Dr. Spiro's valuation (before discounting) of each share of Korbel under his market approach.

### 2. Comparability

Dr. Spiro treated Mondavi and Canandaigua as comparable (guideline) companies despite acknowledging that, in many significant respects, they differ markedly from Korbel.

Size: In 1994, in terms of both revenue and total assets, Canandaigua was approximately 10 times as large as Korbel.

Mondavi's gross revenue for its 1994 fiscal year was more than twice that of Korbel for its 1994 calendar year ($176,236,000 versus $82,758,000), and Mondavi's total assets at yearend were approximately triple those of Korbel ($244,236,000 versus $84,043,000).

Product Lines:  Although Korbel produces some brandy and an insignificant amount of still wine, it is essentially a single product company, producing economically priced premium champagne. In 1992, Canandaigua's products included table wines, dessert wines, sparkling wines, imported beer, and distilled spirits. Sparkling wines constituted only 3.79 percent of the firm's total shipments for 1993.

As of the valuation date, Korbel marketed its champagne under two labels, Armstrong Ridge and Korbel.  Canandaigua marketed its products under many brand names including Paul Masson, Inglenook, Manischewitz, Almaden, and Taylor California Cellars, for wine, and Corona, for beer.  Although Canandaigua also produced and marketed six different brands of sparkling wine and maintained a 32-percent share of the sparkling wine market for 1994, all of its sparkling wines were produced using the less expensive Charmat process or transfer method, whereas Korbel utilized the methode champenoise exclusively.  Canandaigua produced for the low end of the champagne market, whereas Korbel was the leading producer of premium champagne, controlling almost

50 percent of the methode champenoise or high-end market and 8.8 percent of the total domestic market.  For the period 1985 through 1994, the low-end and high-end champagne markets fared differently.  Sales of champagne produced by means of the Charmat process or transfer method (the low-end market) fell steadily between 1985 and 1994.  In 1994, sales of the lower priced domestically produced Charmat process and transfer method labels dropped 11 percent, when compared to 1993.  Canandaigua's sparkling wine sales reflected that trend in 1994, declining by about 8 percent from 1993.  In sharp contrast, led by Korbel's 6-percent increase in champagne sales for 1994, 1994 sales by domestic methode champenoise producers as a whole grew 4 percent, when compared to 1993.

Mondavi markets premium still wine under seven different labels, but it produces little or no sparkling wine.[3]

Other Factors:  Dr. Spiro testified that, as of the valuation date, compared to Mondavi and Canandaigua, Korbel was smaller, more profitable, and growing more slowly.  It also had

---

[3]  Both Drs. Bajaj and Spiro state that Mondavi does not produce any champagne.  Gary Heck testified, however, that Mondavi produces "about 1500 cases [of champagne] that they only sell through their wine shop, kind of like we do with still wines."  Even if Mr. Heck is correct, the amount of champagne produced by Mondavi is negligible in comparison with its wine production, which, for 1994, was 4,274,000 cases.  Thus, as a practical matter, Mondavi was a producer of still wines, whereas Korbel was a producer of high-end champagne and a small amount of brandy.

substantially lower debt to asset and debt to equity ratios than either Canandaigua or Mondavi.

Dr. Spiro summarized the totality of the differences between Korbel and both Mondavi and Canandaigua as follows:

> Whereas both comparable companies produce and/or market many products, Korbel essentially only produces two products, champagne and brandy. Korbel also has less revenue and greater revenue variability during the course of a fiscal year than the two comparables. Korbel's greater revenue variability results from the nature of champagne consumption in the U.S., which is closely linked to celebrations and parties. This results in a seasonal sales pattern with most sales coinciding with the holiday season between Thanksgiving and New Year's Eve. In contrast, wine is consumed more steadily throughout the year, often with dinner or as a social drink. Korbel's lack of product diversification and comparatively small size tend to increase investor risk, necessitating a greater investment return. * * *

Gary Heck testified to the following significant differences between the production and marketing of wine as opposed to methode champenoise champagne: The second fermentation in the bottle, which makes production of the latter more complex, expensive, and time consuming than the production of wine; the fact that sales of champagne do not benefit from the so-called "French Paradox" (i.e., reports that link the moderate daily consumption of red wine to cardiovascular health); and the fact that champagne sales are subject to higher Federal excise taxes than are sales of wine.

### 3. Dr. Spiro's Opinion

In Dr. Spiro's opinion, comparability is established by the fact that both Mondavi and Canandaigua, like Korbel, produce, a

form of wine ("While Korbel occupies a specialized niche, it crushes grapes, ferments the juice and bottles the product like other producers.  To argue that comparables do not exist is incorrect.").[4]

> C.  Rejection of Mondavi and Canandaigua as Guideline Companies

Dr. Spiro discussed the similarities and differences between both Mondavi and Canandaigua and Korbel, and he computed price to earnings and price to operating cashflow multiples for both Mondavi and Canandaigua.  Nevertheless, when he applied those multiples to Korbel, he referred only to Mondavi, and he adjusted downward from the Mondavi figures.  We fail to see how Canandaigua influenced Dr. Spiro's guideline analysis.  It appears to us that Dr. Spiro, himself, effectively disregarded Canandaigua as a guideline company.  Assuming that to be the case, respondent has failed to persuade us that we should have any confidence in Dr. Spiro's guideline analysis.  In Estate of Hall v. Commissioner, 92 T.C. 312 (1989), the Commissioner's expert selected only one comparable company.  The proposed comparable, American Greetings Corp. (American Greetings), was selected because it, along with Hallmark Cards, Inc. (Hallmark),

---

[4]  Dr. Spiro's oral testimony echoed that view:  "Sir, we selected * * * [Mondavi and Canandaigua] as guideline companies, as the only game in town.  We did not say they were exactly like Korbel.  We say they have the same general production approach.  They have the same general customer base.  They are all in the grape processing business.  In that sense they are comparable."

the company subject to valuation, were the two leaders in the greeting card industry. The Commissioner's expert concluded that American Greetings "was the only reasonably comparable company to Hallmark because it had a similar product mix and capital structure and served the same markets." Id. at 331. We rejected the valuation report submitted by the Commissioner's expert in light of his reliance on a single comparable company in employing the market approach. In so doing, we observed that "[a]ny one company may have unique individual characteristics that may distort the comparison." Id. at 340. A sample of one tells us little about what is normal for the population in question.[5] Dr. Spiro has failed to convince us of the reliability of his guideline analysis.

Even if we were to accept that Dr. Spiro relied on both Canandaigua and Mondavi as guideline companies, as respondent argues, we would still reject Dr. Spiro's use of the market approach in this case. Respondent points out that we have approved the use of the market approach based upon as few as two guideline companies. See Estate of Desmond v. Commissioner, T.C. Memo. 1999-76. But in that case, all three companies were in the same, and not just a similar, line of business (manufacture and

_____

[5] In his rebuttal report, Dr. Bajaj states: "The superior quality of Mondavi's wines, its innovative packaging [a new bottle with a flange top that prevented dripping and used a dot of wax instead of a foil capsule as a seal] and strong advertising coupled with its reputation as an environment-friendly producer * * * [were attributes that] were largely unique to * * * [Mondavi]". (Fn. ref. omitted.) Respondent does not challenge Dr. Bajaj on that point, which point indicates that Mondavi may not be reflective of the norm.

sale of paint and coatings). Here, Mondavi and Canandaigua were, at best, involved in similar lines of business. Under section 2031(b) and section 20.2031-2(f), Estate Tax Regs., publicly held companies involved in similar lines of business may constitute guideline companies, and we have so held. See, e.g., Estate of Gallo v. Commissioner, T.C. Memo. 1985-363, where, in valuing the stock of the largest producer of wine in the United States, we approved the use by taxpayer's experts of comparables consisting of companies in the brewing, distilling, soft drink, and even food processing industries. But, in that case, the experts used at least 10 companies as guideline companies. See also Estate of Hall v. Commissioner, supra at 325, where we adopted an expert report utilizing a market approach based upon a comparison with six somewhat similar companies. As similarity to the company to be valued decreases, the number of required comparables increases in order to minimize the risk that the results will be distorted by attributes unique to each of the guideline companies. In this case, we find that Mondavi and Canandaigua were not sufficiently similar to Korbel to permit the use of a market approach based upon those two companies alone.[6]

---

[6] Dr. Bajaj argues that only companies that are "primarily champagne/sparkling wine producers like Korbel" constitute permissible guideline companies. Because no such publicly traded company existed, Dr. Bajaj rejected the market approach. We find Dr. Bajaj's approach to be unduly narrow (in theory), in light of the case law cited in the text. Nonetheless, we agree, albeit for different reasons, that respondent improperly applied the market approach in this case.

Our conclusion that Dr. Spiro improperly applied the guideline company approach based upon Mondavi and Canandaigua makes it unnecessary to address petitioner's other criticisms of Dr. Spiro's application of that approach:  The selection of inappropriate financial ratios, the arbitrary adjustment of those ratios, and the arbitrary nature of the weight given to the result reached by Dr. Spiro under the market approach.

D.  Conclusion

Dr. Spiro improperly applied the guideline company approach in valuing the stock of Korbel.

V.  Utilization of the Discounted Cashflow Method in Valuing the Stock of Korbel

A.  Introduction

This Court considers the discounted cashflow (DCF) method employed by both experts to be an appropriate method for use in valuing corporate stock.  See, e.g., N. Trust Co. v. Commissioner, 87 T.C. 349, 379 (1986).  Moreover, where we have rejected use of the market approach as unreliable, we have based the value of a closely held corporation on the DCF approach alone.  See Estate of Jung v. Commissioner, 101 T.C. 412, 433 (1993).  We, therefore, find that the DCF method utilized by both experts in this case is an appropriate method for valuing the stock of Korbel as of the valuation date.

B.  Analysis of the Experts' Application of the Discounted
    Cashflow Method

    1.  Introduction

Recently, in Estate of True v. Commissioner, T.C. Memo.

2001-167, we described the DCF method as follows:

> The discounted cash-flow method is an income
> approach based on the premise that the subject
> company's market value is measured by the present value
> of future economic income it expects to realize for the
> benefit of its owners.  This approach analyzes the
> subject company's revenue growth, expenses, and capital
> structure, as well as the industry in which it
> operates.  The subject company's future cash-flows are
> estimated, and the present value of those cash-flows is
> determined based on an appropriate risk-adjusted rate
> of return.

Drs. Bajaj and Spiro are in agreement as to the elements of

the DCF valuation method:  The discounted present value of

cashflow projections for Korbel over a 5-year (1995-1999) period,

plus Korbel's residual value at the end of the fifth year (also

discounted back to present value), plus the value of nonoperating

assets, less long-term debt, and less appropriate discounts,

e.g., for lack of marketability.  They disagree, however,

regarding the computation of almost every element, including

projected revenues, operating costs, capital expenditures, the

rate of return to be incorporated into the discount factor, the

nature and amount of the nonoperating assets, the amount of long-

term debt, and the nature and amount of the discounts.  We find

neither of the experts totally persuasive.  We accept, however,

portions of the testimony of each.  We shall discuss and evaluate

the various elements of both experts' DCF computations in arriving at a value for the shares.

2. <u>Projected Cashflows</u>

a. <u>Sales</u>

In projecting post-1994 sales growth for Korbel, Dr. Bajaj determined that there would be 2-percent sales growth for 1995, that the growth rate would steadily increase to 4.5 percent in 1999, and that the latter rate would prevail indefinitely for post-1999 years. Dr. Bajaj considered his forecast optimistic in light of wine industry analysts' predictions of a 2.9-percent decline in champagne consumption during the 1995-1999 period. Dr. Spiro projected a 4.5-percent sales increase for 1995, increases of 4.0, 3.5, and 3.0 percent for 1996, 1997, and 1998, respectively, and 3-percent annual increases thereafter. Dr. Spiro's forecast was primarily based upon the strong growth in Korbel's sales during 1994 and the first quarter of 1995.

We find Dr. Spiro's sales growth assumptions to be the more realistic. Projected growth for 1995 is based upon Korbel's 1994 sales growth, and subsequent years' growth is assumed to gradually decrease to the 3-percent growth rate applicable to 1992-1994, which does not differ materially from the annual compound growth rate of 3.1 percent since 1984. Dr. Bajaj's more modest sales growth projections for the early years are based upon projected sales for the champagne industry as a whole, which

includes low-end Charmat and transfer process brands.  Moreover, we find no evidence in Korbel's recent sales history to justify an assumed 4.5-percent sales growth for 1999 and thereafter.

 b.  Operating Margin

 Dr. Bajaj's projected annual operating (pretax)[7] margin (total revenues less cost of goods sold, excise taxes, depreciation, officers' compensation, and selling, general, and administrative expenses (SG&A)) for 1995 and all subsequent years is 12 percent of sales revenues.  He bases his projection upon the 5-year simple average of operating margins for the 1990-1994 period.  Dr. Spiro's projected annual operating margin for 1995-1999 and subsequent years is 13.3 percent of sales revenues. Dr. Spiro computes each element of cost entering into his projection of operating margin separately, in some cases based upon 2-year averages, in others, based upon 5-year averages.  In computing average annual SG&A for 1990-1994, Dr. Spiro fails to include $420,000 of promotional expenses incurred by Korbel in 1993, which Dr. Spiro attributes to the launching of a new product (Armstrong Ridge champagne).  Dr. Spiro considers that to be a special, nonrecurring cost that, in future years, will be borne by Brown-Forman pursuant to the Brown-Forman agreement.  We do not agree with Dr. Spiro's treatment of the 1993 promotional

---

 [7] The parties agree that the only tax applicable to the income of Korbel is California's 1.5-percent income tax on S corporations.

expense as a nonrecurring cost. Mr. Heck testified that new label promotional expenditures are a recurring feature of Korbel's business. Although the Brown-Forman agreement relieves Korbel of any responsibility to pay marketing or selling expenses ("Brand Expense") for Korbel champagne or brandy, Korbel incurred the promotional expenses in question subsequent to the 1991 effective date of the agreement, and Mr. Heck testified that a similar "spike" in Korbel's promotional costs could occur at any time. Projecting the mean annual SG&A costs for a 5-year period that includes a year of extraordinary promotional expenses associated with the introduction of a new label does not seem unreasonable.

Dr. Spiro criticizes Dr. Bajaj for relying on a simple 5-year average in projecting an annual operating margin. Yet for cost of goods sold, where Dr. Spiro uses a 2-year average to make projections, he testified, in rebuttal: "The * * * [rate chosen by Dr. Bajaj] appears reasonable although we once again question the use of a simple average." Dr. Spiro, himself, uses a 5-year average in projecting officers' compensation and SG&A. Korbel's annual operating margins for the 1990-1994 period do not show a trend, and Dr. Spiro has failed to convince us that Dr. Bajaj's use of a 5-year simple average is inappropriate. At least, it has the virtue of consistency, and for that reason, we prefer it to Dr. Spiro's approach, the inconsistency of which he did not

adequately explain.  We modify Dr. Bajaj's approach only to take into account small amounts of other income, which he takes into account in his rebuttal testimony.  Dr. Bajaj's projected profit margin, based upon an unweighted arithmetic average of operating margins from 1990-1994, and including "other income" (interest and "Heck Cellars" revenue), is 12.3 percent.  We find that to be the proper assumed operating margin for purposes of determining Korbel's value on the valuation date under the DCF method.

### c.  Cashflow Adjustments

To determine cashflow, it is necessary to modify after-tax income by adding back depreciation and subtracting working capital additions and capital expenditures.

Depreciation averaged 3.8 percent of sales revenues during the 1990-1994 period and 4.1 percent for 1993 and 1994. Dr. Bajaj, relying on a 5-year average, projected depreciation at 3.8 percent of gross sales and Dr. Spiro, relying on a 2-year average, projected it at 4.0 percent of gross sales.  Although, for 4 out of the 5 years, total depreciation grew as a percentage of sales revenues, the question is whether the most recent 2 years is a better measure of the trend than the last 5 years. Neither expert took the other head-on with respect to this point, and, since, in general, we found Dr. Bajaj's analysis to be more thorough than Dr. Spiro's, we shall rely on his 5-year average as determinative.

Both Drs. Bajaj and Spiro project inventory expenditures to remain constant at 50 percent of sales revenue. However, Dr. Bajaj projects "other working capital" (including cash) at 5 percent of sales whereas Dr. Spiro projects noninventory working capital at 3.5 percent of sales (in both cases, based on historical data). Dr. Spiro justifies his lower figure by discounting the 1993 and 1994 average working capital level (11.7 percent) on the ground that it was largely attributable to "excess cash". As we discuss, infra (in connection with our analysis of Korbel's nonoperating assets), we do not believe Korbel retained excess cash in 1993 and 1994. We are persuaded that Dr. Bajaj's projection of working capital levels is justified based on historical performance, and we find in accordance with his calculation.

Dr. Spiro projected annual capital expenditures by Korbel equal to $4 million for 1995 and every year thereafter. Dr. Bajaj projected annual capital expenditures on the assumption that they would equal depreciation plus 30 percent of Korbel's annual sales increases. Dr. Bajaj projected that capital expenditures would increase in an amount adequate to maintain Korbel's net fixed asset to sales ratio at 30 percent, which is slightly below the average of such ratios for the 1990-1994 period. Each expert points to unreasonable aspects of the other's approach: Dr. Bajaj to the fact that Dr. Spiro's

approach will eventually lead to negative net asset value,
Dr. Spiro to the fact that Dr. Bajaj's projected increases in
capital expenditures more than double his projected sales
increases over the 1995-1999 period.

Korbel's financial statements for the 1985-1994 period show
that, whereas depreciation increased annually, capital
expenditures ("property, plant and equipment purchased") have
fluctuated significantly over that same period, the low of
$2,315,000 occurring in 1990 and the high of $6,142,000, in 1991.
Average annual capital expenditures for the 1990-1994 period were
$3,817,000. Therefore, we consider Dr. Spiro's projection of $4
million in annual capital expenditures to be reasonable, and we
adopt it. Conversely, we find nothing in Korbel's financial
history to support Dr. Bajaj's projection of ever-increasing
annual capital expenditures.

### 3. Rate of Return

The DCF method involves the computation of the present value
of expected future cashflows. The present value of a cashflow
equals the cashflow multiplied by a discount factor (less than
1). The discount factor is usually expressed as the reciprocal
of 1 plus a rate of return: Discount factor (for one period) =
$1/(1 + r)$.[8] Drs. Bajaj and Spiro agree that the rate of return

---

[8] See Brealey & Myers, Principles of Corporate Finance 16
(6th ed. 2000) ("The rate of return $r$ is the reward that
(continued...)

to be used in applying the DCF method to Korbel's cashflows is Korbel's "weighted average cost of capital" (WACC).[9] Dr. Bajaj computed the WACC as 14.22 percent; Dr. Spiro computed it as 16.54 percent. Their only significant disagreement is as to one component of the WACC, the cost of equity capital.[10] Dr. Bajaj computed the cost of equity capital as 14.70 percent; Dr. Spiro computed it as 16.71 percent.

We need not engage in an extended discussion of the appropriate cost of equity capital since, in computing the WACC, other things being equal, the higher the cost of equity capital (i.e., the larger the percentage), the larger the WACC. Given the DCF method, the larger the WACC, the lower the present value of expected cashflows. The parties endorse the DCF method, differing only as the value of certain variables. Since we are

---

[8](...continued)
investors demand for accepting delayed payment.").

[9] As expressed by Dr. Spiro:

$$WACC = W_d \; x \; K_d \; x \; (1-t) \; + \; W_e \; x \; K_e$$

Where:
    $WACC$ = weighted average cost of capital,
    $W_d$   = weight of debt in capital structure,
    $K_d$   = estimated pretax cost of debt,
    $t$     = income taxes at 1.5 percent,
    $W_e$   = weight of equity in capital structure, and
    $K_e$   = cost of equity capital.

[10] Dr. Spiro defined the cost of equity capital as follows: "[T]he rate of return required by an investor as sufficient compensation for committing equity funding to the business."

deconstructing each expert's DCF analysis, and assembling our own, our adopting Dr. Bajaj's cost of equity capital cannot, in isolation, be objectionable to respondent, since respondent has proposed that we find a higher, 16.71-percent cost of equity capital.  Dr. Bajaj relied on the capital asset pricing model (which takes into account exclusively systematic (or market) risk) to compute the cost of equity capital, while Dr. Spiro relied on the so-called buildup method (which pays attention to the unsystematic (or individual) risk that an investor would face in investing in Korbel).  Neither expert convinced us that his approach was significantly better (on the facts at hand) than the other expert's approach, and we are satisfied that 14.70 percent (the percentage reached by Dr. Bajaj) is a reasonable figure for Korbel's cost of equity capital, and we so find.[11]  We find that the WACC is 14.22 percent.

---

[11]  In recent cases, we have criticized the use of both the capital asset pricing model (CAPM) and WACC as analytical tools in valuing the stock of closely held corporations.  See Furman v. Commissioner, T.C. Memo. 1998-157.  See also Estate of Maggos v. Commissioner, T.C. Memo. 2000-129 and Estate of Hendrickson v. Commissioner, T.C. Memo. 1999-278, which reaffirm that view, citing Furman, and Estate of Klauss v. Commissioner, T.C. Memo. 2000-191, where we rejected an expert valuation utilizing CAPM in favor of one utilizing the buildup method.  In other recent cases, however, we have adopted expert reports which valued closely held corporations utilizing CAPM to derive an appropriate cost of equity capital.  See BTR Dunlop Holdings, Inc. v. Commissioner, T.C. Memo. 1999-377; Gross v. Commissioner, T.C. Memo. 1999-254, affd. 272 F.3d 333 (6th Cir. 2001)

4. <u>Present Value Computation:  Yearend Versus Mid-Year Cashflow Convention</u>

In computing the present value of all cashflows, Dr. Bajaj adopted a yearend convention (cashflows discounted as of yearend), while Dr. Spiro adopted a midyear convention (cashflows assumed to be received at, and discounted from, midyear). Because, under the midyear convention, the cashflow for a year is deemed to have been received 6 months earlier, the discount factor for the year is slightly greater (and the dollar amount of the discount itself is slightly smaller) than if the yearend convention is adopted.  Given the same cashflow but a greater discount factor, the present value of the cashflow is greater.

The parties agree that (1) approximately 60 percent of Korbel's champagne sales occur during the last quarter of the calendar year and (2) as much as 20 percent of such sales occur during the last week of December.  Since Korbel's revenues are not spread evenly throughout the year, we are unconvinced that Dr. Spiro's use of the midyear convention results in a more accurate valuation than Dr. Bajaj's use of the yearend convention.  We adopt the yearend convention.

5. <u>Increase in Korbel's Value for Nonoperating Assets</u>

a. <u>Introduction</u>

The question here is whether the value of certain nonoperating assets should be added to the value determined under the DCF method in determining the value of the shares.

b.  Excess Land; Insurance Proceeds; KFTY Receivable

The parties agree, and we find, that the excess land constitutes a nonoperating asset to be added to the present value of Korbel's cashflows at a value of $2,198,000 and that insurance proceeds in the amount of $1,110,000 likewise are to be so added. Although they differ in exactly how a receivable from KFTY in the amount of $2,209,000 is to be taken into account, they agree that it is to be taken into account.  We agree and so find.  The total of the aforesaid nonoperating assets is $5,517,000

c.  Excess Cash

Dr. Spiro considered $5,250,000 of cash held by Korbel on December 31, 1994, to be a nonoperating asset, which he referred to as "excess cash".  Dr. Spiro reached that conclusion by examining historical cash levels in relation to gross revenue, in order to determine the appropriate "normalized" cash level, which he determined to be 6.55 percent of gross revenue.  Applying that percentage to 1994 gross revenue, Dr. Spiro concluded that Korbel had excess cash in the amount stated.  In determining the value of the shares, he included only a portion of the excess cash to reflect the inability of minority shareholders to force a distribution of such cash.  Dr. Bajaj concluded that there was no excess cash, and, in his rebuttal testimony, he persuasively explained his basis for that conclusion.  We were impressed with his interpretation of the historical data, in light of the

information he received (the need to retain funds for a number of contingencies) on interviewing Mr. Heck.  On the basis of his testimony, we find that there was no nonoperating asset consisting of excess cash.

### 6.  Decrease in Korbel's Value by Amount of Long-Term Debt

Putting aside Drs. Bajaj and Spiro's disagreement over the treatment of the KFTY receivable, see supra p. 35, the remaining disagreement is over whether the current portion of long-term bank borrowings is a component of working capital or a long-term liability.  On brief, respondent states that any resulting difference in the value of the shares is immaterial, and the choice of treatment is "a valid choice of the appraiser".  We shall treat such current portion as a long-term liability.

### 7.  Discounts

#### a.  The Expert Testimony

Dr. Bajaj determined that the shares were subject to a 25-percent basic marketability discount.  Dr. Bajaj then added an additional 10 percent to his basic marketability discount, which addition was attributable to both the right of first refusal (ROFR) held by Brown-Forman and what he refers to as "agency problems", the fact that the shares represented a minority interest unable to influence the majority shareholder's control over cash distributions.  The addition of those two discounts

resulted in Dr. Bajaj's determination of an overall 35-percent discount, which he treats, in total, as a marketability discount.

Dr. Spiro determined a basic 15-percent liquidity discount,[12] increased by an additional 10 percent for risks associated with Korbel's status as an S corporation. Thus, Dr. Spiro's total liquidity discount is 25 percent, which he applies to the values that he determined under his market and income approaches (i.e., values exclusive of the value of nonoperating assets). Dr. Spiro applied specific, separate discounts to nonoperating assets: A 25-percent minority discount followed by his overall 25-percent liquidity discount applicable to "excess land"[13] and a 25-percent minority discount applicable to "excess cash".

b. <u>Marketability Versus Minority Discounts</u>

We have recognized that there is a distinction between a discount for lack of marketability and a discount for the minority position of the interest to be valued. As we stated in <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 953 (1982):

> The minority shareholder discount is designed to
> reflect the decreased value of shares that do not
> convey control of a closely held corporation. The lack
> of marketability discount, on the other hand, is

---

[12] We interpret Dr. Bajaj's references to a "marketability" discount and Dr. Spiro's references to a "liquidity" discount as references to the same type of discount.

[13] Because Dr. Spiro applies the two discounts consecutively, the total discount is 43.75 percent: $0.25 + (0.25 \times 0.75) = 0.4375$.

designed to reflect the fact that there is no ready
market for shares in a closely held corporation.
Although there may be some overlap between these two
discounts in that lack of control may reduce
marketability, it should be borne in mind that even
controlling shares in a nonpublic corporation suffer
from lack of marketability because of the absence of a
ready private placement market and the fact that
flotation costs would have to be incurred if the
corporation were to publicly offer its stock.  * * *

    c.  Basic Discount for Lack of Marketability

Dr. Bajaj's 25-percent marketability discount is based upon
a number of empirical studies, his critical evaluation of those
studies, and his own multiple regression analysis of the
"explanatory variables".  Dr. Spiro, in his rebuttal testimony,
finds no fault with Dr. Bajaj's methodology.

Dr. Spiro cites many of the same empirical studies as
suggesting that liquidity discounts can range from 10 to 45
percent.  He states that the average discounts were "often in
excess of 35 percent."  Yet, Dr. Spiro concludes that the basic
liquidity discount for the shares, taking into account the ROFR,
is appropriately set at 15 percent.  Dr. Spiro fails to make
clear, in either his primary or rebuttal report, the basis for
his determination that the appropriate liquidity discount is at
the low end of the acceptable range of such discounts.  In his
oral testimony, he set forth his theory that there was a
specialized group of purchasers who would value the shares on
other than an investment basis (who would eye Korbel as a
possible future joint venture partner).  Dr. Spiro failed to

quantify or explain how he adjusted his analysis to take account of that factor. Indeed, such factor has recently been rejected by the Court of Appeals for the Ninth Circuit, the likely venue of any appeal in this case. Estate of Simplot v. Commissioner, 249 F.3d 1191, 1195 (9th Cir. 2001), revg. 112 T.C. 130 (1999). We did not find Dr. Spiro's oral testimony to be persuasive. It did not bolster what we found to be weak analysis in his written reports.

We found Dr. Bajaj's analysis in support of his 25-percent basic discount to be both thorough and convincing, and we find that a basic discount for lack of marketability in the amount of 25 percent is appropriate.

### d. Additional Discounts

#### (1) Discount for Lack of Control

Dr. Bajaj describes his entire 35-percent discount as a discount for lack of marketability. We view his proposed discount for "agency problems", however, as a discount for minority status (or lack of control), as it is based upon the inability of the owner of the shares to force the majority shareholder, Gary Heck, to make dividend distributions. Dr. Bajaj's discount for minority status takes into account factors similar to what Dr. Spiro took into account in addressing problems associated with Korbel's S corporation status, at least to the extent that Dr. Spiro's discount relates to the same lack

of control problem.[14]  Thus, we view Drs. Bajaj and Spiro in basic agreement as regards the need for a discount for lack of control, which we view as a minority status discount.

(2)  Discount for Brown-Forman's ROFR

Both experts agree that some discount for the ROFR is warranted.  Dr. Spiro includes the ROFR as part of his basic 15-percent liquidity discount, Dr. Bajaj as part of his additional 10-percent discount for both the ROFR and the minority interest's lack of control.

Dr. Bajaj views the ROFR as a much more serious impediment to marketability than does Dr. Spiro.  He argues that, because of its ROFR, Brown-Forman is always a potential bidder for an available block of Korbel stock.  He further argues that, because it had been the sole distributor of Korbel champagne and brandy for a number of years, Brown-Forman knows more about Korbel than any potential outside bidder.  As a result, any other outside bidder would have to expend a great deal of effort and money to even approach Brown-Forman's knowledge level concerning Korbel, without which it may offer too little and risk losing out to Brown-Forman, or too much and risk making a bad deal.  Also, because Brown-Forman has a special interest in retaining its sole

---

[14]  Dr. Spiro also states that, as an S corporation, Korbel is subject to several restrictions impairing liquidity, including restrictions on the number and type of persons that can be shareholders.  Nevertheless, he views S corporation status as a benefit and fails to quantify the relevant advantages and disadvantages.

distributor position, it will have a tendency to drive up the price beyond what a potential buyer would be willing to pay based upon the present value of anticipated cashflows. According to Dr. Bajaj, both of those factors act as a significant deterrence to would-be bidders for the shares, and, therefore, they reduce the value of the shares.

In his rebuttal testimony, Dr. Spiro responds that Korbel is not "such a complex organization that the costs of analyzing the company for bidding purposes would be prohibitively high." Dr. Spiro argues that Dr. Bajaj's concerns regarding Brown-Forman's ROFR "are more appropriately applied to * * * [complex high-tech companies] where the 'hidden' value of * * * [intellectual property] can make accurate analysis difficult and expensive, especially for an outsider." Dr. Spiro agrees, however, that some discount is warranted for the ROFR and, as noted above, has included it as part of its basic 15-percent liquidity discount.

### (3) Amount of Additional Discounts

We agree with Dr. Bajaj that an additional 10-percent discount for Brown-Forman's ROFR and the purchaser's lack of control over future dividend-liquidation policy (i.e., the purchaser's minority status) is warranted. We ascribe most of that discount to the minority status issue, which both Drs. Bajaj and Spiro agree deserves recognition. Both Drs. Bajaj and Spiro

also believe that the ROFR would reduce value, but disagree both as to rationale and quantum.  We are satisfied that some amount of discount is attributable to the ROFR and that 10 percent is an appropriate discount for both the ROFR and the purchaser's minority status, given Dr. Spiro's addition of a 10-percent discount for only Korbel's status as an S corporation.

### (4)  AVG's Discounts From the Value of Nonoperating Assets

Dr. Bajaj applied an overall 35-percent marketability discount to his total valuation of Korbel, which included nonoperating assets.  Dr. Spiro applied a 25-percent liquidity discount to his valuation of Korbel, not including nonoperating assets.  As noted supra p. 37, he then applied separate additional discounts to what he considered nonoperating assets. We reject Dr. Spiro's 25-percent minority discount applied to "excess cash" on the basis of our finding that Korbel retained no excess cash as of the valuation date.  We also reject Dr. Spiro's 43.75-percent combination minority/liquidity discount applied by him to the excess land in favor of Dr. Bajaj's 35-percent overall discount applied to his total valuation of Korbel, including such excess land.  We see no reason to limit a minority discount to particular assets of Korbel even if they are  nonoperating assets and, therefore, more readily available for distribution to shareholders than are Korbel's operating assets.  As we observed in Estate of Fleming v. Commissioner, T.C. Memo. 1997-484, a

minority discount generally "reflects the minority shareholder's inability to compel liquidation and thereby realize a pro rata share of the corporation's net asset value"; i.e., the minority shareholder's share of <u>total</u> corporate net asset value.

C.   <u>Conclusion</u>

On the basis of the foregoing application of the DCF method, taking into account certain discounts, we find that the fair market value of the shares as of the valuation date was $20,269,736, or $32,174 a share.   See Appendix.

VI.   <u>Conclusion</u>

We shall redetermine a deficiency in Federal estate tax commensurate with our finding that the value of the shares as of the valuation date was $20,269,736.

<u>Decision will be entered</u>

<u>under Rule 155</u>.

Appendix:

## Valuation of 630 Shares of R. Korbel & Bros., Inc. as of 2/15/95

| Projected Items | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|
| Sales | $82,757,920 | $86,482,026 | $89,941,307 | $93,089,252 | $95,881,929 | $98,758,386 |
| **Net Income** | | | | | | |
| Pre-Tax Income (@ 12.3% op. margin) | | 10,637,289 | 11,062,780 | 11,449,977 | 11,793,477 | 12,147,281 |
| Income Taxes (@ 1.5%) | | (159,559) | (165,942) | (171,750) | (176,902) | (182,209) |
| Net Income | | 10,477,730 | 10,896,838 | 11,278,227 | 11,616,575 | 11,965,072 |
| **Cashflow Adjustments** | | | | | | |
| + Depreciation (3.8% of sales) | | 3,286,317 | 3,417,770 | 3,537,391 | 3,643,513 | 3,752,819 |
| (−) Working Capital Additions (55% of incremental sales) | | (2,048,258) | (1,902,605) | (1,731,370) | (1,535,972) | (1,582,051) |
| (−) Capital Expenditures | | (4,000,000) | (4,000,000) | (4,000,000) | (4,000,000) | (4,000,OOO) |
| Yearend Cashflow | | 7,715,789 | 8,412,003 | 9,084,248 | 9,724,116 | 10,135,840 |
| Discount Rate (WACC) | | 14.22% | 14.22% | 14.22% | 14.22% | 14.22% |
| Present Value Interest Factor $(1/(1.1422)^n)$ | | .8755 | .7666 | .6712 | .5876 | .5145 |
| Present Value of Cashflows | | 6,755,173 | 6,448,641 | 6,097,347 | 5,713,891 | 5,214,890 |

Total Present Value of Cashflows $30,229,942

Present Value of Reversion:

$10,135,840 \left(\dfrac{1.03/.1422-.03}{(1 + .1422)^5}\right)$     47,861,436

$= 10,135,840 (4.722)$

| | |
|---|---|
| Present Value of Operating Assets | 78,091,378 |
| Value of Nonoperating Assets | 5,517,000 |
| Long-Term Debt | (4,918,000) |
| Enterprise Value of Korbel (w/o discount) | 78,690,378 |
| Enterprise Value of Korbel with 35% Discount | 51,148,745 |
| Value of 39.629% interest (630 shares) | 20,269,736 |
| Value of each share | 32,174 |