**ESTATE OF Richard R. SIMPLOT, Deceased, John Edward Simplot, Personal Representative, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 00–70013.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2001.

Filed May 14, 2001.

---

1. That is what this court appears to have done in the two unpublished dispositions mentioned above.

Sheldon I. Fink, Sonnenschein Nath & Rosenthal, Chicago, Illinois and D. John Thornton and Gregory A. Byron, Thornton Byron, LLP, Boise, Idaho, for the petitioner-appellant.

Paula Speck, Department of Justice, Washington, D.C., for the respondent-appellee.

Before: HUG, NOONAN, and W. FLETCHER, Circuit Judges.

## OPINION

NOONAN, Circuit Judge:

The Estate of Richard R. Simplot (the Estate) appeals the judgment of the Tax Court determining an estate tax deficiency of $2,162,052. We hold that the Tax Court erroneously attributed a premium to minority voting stock in the J.R. Simplot Co. (Simplot). Accordingly, we reverse the judgment of the Tax Court and remand.

## BACKGROUND AND PROCEEDINGS

Simplot is headquartered in Boise, Idaho and incorporated in Nevada. It processes frozen food, in particular potatoes; mines, processes and sells phosphate fertilizer; owns large numbers of cattle and sells beef; and owns over 13% of the stock of Micron Technology, Inc.

Simplot stock is divided into Class A and Class B common stock. Only Class A has voting rights. Both classes have a right to dividends, if any are declared, on a per share basis. To date, no common stock dividends have ever been declared. Class

B stock has a slight advantage in its treatment on liquidation. Class A stock is subject to a transfer restriction of 360 days during which the company or another Class A shareholder may purchase the stock.

At the time of evaluation the stock was owned as follows:

Class A

| Stockholder | Number of Shares | Percent of Total Class A Shares |
|---|---|---|
| Decedent (Richard Simplot) | 18.000 | 23.55% |
| Don Simplot (Richard's brother) | 18.000 | 23.55 |
| Gay Simplot Otter (Richard's sister) | 18.000 | 23.55 |
| Scott Simplot (Richard's brother) | 22.445 | 29.35% |
| Total | 76.445 | 100.00% |

Class B

| Stockholder | Number of Shares | Percent of Total Class B Shares |
|---|---|---|
| Decedent (Richard Simplot) | 3,942.048 | 2.79% |
| Class A shareholders (Don, Gay and Scott Simplot) | 16,677.303 | 11.79% |
| Family members of Class A shareholders (children, spouses and grandchildren) | 27,042.707 | 19.14% |
| Trusts for descendants of Richard, Don, Gay and Scott Simplot | 88,732.985 | 62.82% |
| Simplot ESOP | 4,893.541 | 3.46% |
| Total | 141,288.584 | 100.00% |

For the fiscal year ending August 31, 1993, Simplot had net sales of $1,282,526,000 and net income of $37,825,000. The equity value of the company, as found by the Tax Court, was $830 million, so that the return to stockholders in 1993 was slightly over 4%.

At the time of valuation, J.R. Simplot, the company's founder, was the chairman of the board and the dominant person in setting company policy. His three surviving children were also directors of the company, and there were four directors from outside the family circle.

The Estate obtained a valuation of its stock from Morgan Stanley & Co., and on this basis reported the Class A and Class B shares as worth $2,650 per share. The Commissioner of Internal Revenue valued the Class A stock at $801,994 per share and the Class B stock at $3,585 per share. He accordingly assessed a deficiency of $17,662,886 with penalties of $7,057,554.

The Estate petitioned the Tax Court for review. Before the Tax Court the Commissioner conceded that the assessed deficiency was erroneous, thereby forfeiting any presumption of correctness. *Clapp v.*

*Commissioner*, 875 F.2d 1396, 1403 (9th Cir.1989); *Herbert v. Commissioner*, 377 F.2d 65, 69 (9th Cir.1966). The Commissioner offered two experts in valuation, Herbert Spiro and Gilbert Matthews, each of whom placed a premium on voting stock because of the skewed relation of the number of voting shares to the number of nonvoting shares. The Estate offered two other valuation experts, Paul J. Much and John R. Ettelson, who testified that the Estate's minority interest in the Class A stock could not extract economic benefits for the shareholder. The Tax Court accepted the valuations proposed by none of the experts, but did accept the view of the Commissioner's experts that a premium should be added to the value of the Class A shares.

The Tax Court found the Class A shares on a per share basis to be "far more valuable than the Class B shares because of the former's inherent potential for influence and control." The Tax Court added that "a hypothetical buyer" of the shares "would gain access to the 'inner circle' of J.R. Simplot Co., and by having a seat at the Class A shareholder's table, over time, the hypothetical buyer potentially could position itself to play a role in the Company. In this regard, we are mindful that 'a journey of a 1,000 miles begins with a single step.' "

The Tax Court went on to "consider the characteristics of the hypothetical buyer" and supposed the buyer could be a Simplot, a competitor, a customer, a supplier, or an investor. The buyer "would probably be well-financed, with a long-term investment horizon and no expectations of near-term benefits. The hypothetical buyer might be primarily interested in only one of J.R. Simplot Co.'s two distinct business activities—its food and chemicals divisions—and be a part of a joint venture (that is, one venture being interested in acquiring the food division and the other

being interested in acquiring the chemical division)." The Tax Court entertained the possibility that Simplot could be made more profitable by being better managed at the behest of an outsider who bought the 18 shares. The Tax Court went on to envisage the day when the hypothetical buyer of the 18 shares would hold the largest block because the three other Simplot children had died and their shares had been divided among their descendants; the Tax Court noted that, even earlier, if combined with Don and Gay's shares together, or with Scott's shares alone, the 18 shares would give control.

In the light of "all of these factors," the Tax Court assigned a premium to the Class A stock over the Class B stock equal to 3% of the equity value of the company, or $24.9 million. Dividing this premium by the number of Class A shares gave each Class A share an individual premium of $325,724.38, for a total value of $331,595.70, subject to a 35% discount for lack of marketability with a resultant value of $215,539. Class B stock was valued at $3,417 per share. The Tax Court held no penalties should be exacted because the Estate in good faith had relied on the advice of its long-term adviser, Morgan Stanley.

The Tax Court determined a deficiency in federal estate tax of $2,162,052. The Estate appeals.

## ANALYSIS

The estate tax is levied not on the property transferred but on the transfer itself. *Young Men's Christian Ass'n v. Davis*, 264 U.S. 47, 50, 44 S.Ct. 291, 68 L.Ed. 558 (1924). The tax is on the act of the testator not on the receipt of the property by the legatees. *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929). Consequently we look at the value of the property in the

decedent's hands at the time of its transfer by death, 26 U.S.C. § 2033, or at the alternative valuation date provided by the statute, 26 U.S.C. § 2032(a). That the tax falls as an excise on the exercise of transfer underlines the point that the value of the transfer is established at that moment; it is not the potential of the property to be realized at a later date.

■ The Tax Court in its opinion accurately stated the law: "The standard is objective, using a purely hypothetical willing buyer and willing seller.... The hypothetical persons are not specific individuals or entities." The Commissioner himself in his brief concedes that it is improper to assume that the buyer would be an outsider. The Tax Court, however, departed from this standard apparently because it believed that "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect value." Obviously the facts that determine value must be considered.

The facts supplied by the Tax Court were imaginary scenarios as to who a purchaser might be, how long the purchaser would be willing to wait without any return on his investment, and what combinations the purchaser might be able to effect with Simplot children or grandchildren and what improvements in management of a highly successful company an outsider purchaser might suggest. "All of these factors," i.e., all of these imagined facts, are what the Tax Court based its 3% premium upon. In violation of the law the Tax Court constructed particular possible purchasers.

■ The Tax Court erred further by finding what premium all the Class A shares as a block would command and then dividing this premium per each Class A share. Doing so, the Tax Court valued an asset not before it—all the Class A stock representing complete control. There was no basis for supposing that whatever value

attached to complete control a proportionate share of that value attached to each fraction of the whole. Under the applicable regulations, the fair market value of "each unit of property" is to be ascertained; in the case of shares of stock, "such unit of property is generally a share of stock." 26 C.F.R. § 20.2031–1(b).

■ The Tax Court committed a third error of law. Even a controlling block of stock is not to be valued at a premium for estate tax purposes, unless the Commissioner can show that a purchaser would be able to use the control "in such a way to assure an increased economic advantage worth paying a premium for." *Ahmanson Foundation v. United States*, 674 F.2d 761, 770 (9th Cir.1981). Here, on liquidation, all Class B shareholders would fare better than Class A shareholders; any premium paid for the 18 Class A shares be lost. Class A and B had the right to the same dividends. What economic benefits attended 18 shares of Class A stock? No "seat at the table" was assured by this minority interest; it could not elect a director. The Commissioner points out that Class A shareholders had formed businesses that did business with Simplot. If these businesses enjoyed special advantages, the Class A shareholders would have been liable for breach of their fiduciary duty to the Class B shareholders. *See Estate of Curry v. United States*, 706 F.2d 1424, 1430 (7th Cir.1983).

■ Much of the Commissioner's argument is devoted to speculation as to what might happen after the valuation date— the Simplots might fall out with each other, the purchaser might find ways of making Simplot more profitable and persuade the company to adopt his strategy, the purchaser might be willing to wait fifteen years to get any return. The speculation is as easily made that the company would go downhill when its founder, J.R. Simplot,

84 at the valuation date, retired; or that McDonald's, Simplot's largest customer for its potatoes, would change its supplier; or that Micron would prove to be an unwise investment. Speculation is easy but not a proper way to value the transfer at the time of the decedent's death. *Olson v. United States,* 292 U.S. 246, 259, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). In Richard Simplot's hands at the time of transfer his stock was worth what a willing buyer would have paid for the economic benefits presently attached to the stock. By this standard, a minority holding Class A share was worth no more than a Class B share.

The judgment of the Tax Court is accordingly REVERSED, and the case is REMANDED for entry of judgment in favor of the Estate.

WILLIAM A. FLETCHER, Circuit Judge, dissenting:

I respectfully dissent.

I agree with the majority that the question before us is the value of 18 shares of A stock in the J.R. Simplot Co. at the time of Richard R. Simplot's death. Because I can find no clear error either in the value the Tax Court found for the A shares, or in the methodology that it employed to determine that value, I would affirm the Tax Court's decision.

## I

There are two classes of Simplot Co. stock, A and B. Class A shares have voting rights; class B shares do not. There are 76.445 A shares and 141,288.584 B shares. The A and B shares have equal rights to dividends and to liquidation distributions. That is, one A share receives precisely as much as one B share. A right of first refusal applies to anyone who wishes to sell A shares. Any shareholder who wishes to sell A shares must first give the company 180 days in which to purchase the shares on the same terms as those

which the shareholder offered to the would-be purchaser. If the company does not purchase the shares, the shareholder must offer the shares, on the same terms, to the other A shareholders for a second period of 180 days.

Richard Simplot was one of four children of the company's founder, J.R. Simplot. Richard and his siblings were the only owners of the A shares. At the time of Richard's death, Richard, Don Simplot, and Gay Simplot Otter each owned 18 A shares, each representing 23.55% of the A shares. Scott Simplot owned 22.445 A shares, representing 29.35% of the A shares.

Richard also owned 2.79% of the B shares at the time of his death, while Don, Gay, and Scott owned 3.04%, 3.12%, and 5.65% of the B shares, respectively. A trust, whose beneficiaries were Richard's family members, owned 20.46% of the B shares. Another trust, whose beneficiaries were Richard's and Don's family members, owned 24.65% of the B shares. A third trust, whose beneficiaries were other Simplot family members and their affiliates, owned 19.14% of the B shares. An employee stock option plan owned the remaining 3.46% of the B shares.

Simplot Co. was founded in the 1930s and incorporated in 1955. The company has never, in its entire history, paid a dividend to its shareholders. During fiscal year 1993, which ended two months after Richard's death, the company made a profit of $37,825,000 on net sales and other income of $1,798,176,000. The parties agree with the Tax Court's conclusion that at the date of Richard's death, the total equity value of the company was $830,000,000.

The Tax Court determined that the 18 A shares owned by Richard's estate were worth approximately $3.9 million. The

question before us is whether this finding can be sustained.

## II

I begin by noting that valuations are factual findings to which we apply a highly deferential standard of review. *See Sammons v. Comm'r*, 838 F.2d 330, 333–34 (9th Cir.1988) ("Trial courts have particularly broad discretion with respect to questions of valuation."). Our deference extends to the Tax Court's choice of a valuation methodology. *See Estate of O'Connell v. Comm'r*, 640 F.2d 249, 251–52 (9th Cir. 1981) (the Tax Court has "broad discretion in determining what method of valuation most fairly represents the fair market value of the stock in issue in light of the facts presented at trial"). We can reverse only if the Tax Court's findings were clearly erroneous. *See Trust Services of America, Inc. v. United States*, 885 F.2d 561, 568 (9th Cir.1989).

The relevant regulations state that the value of each item of property in the decedent's estate should be measured by its "fair market value," defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 20.2031–1(b).

Why would a willing buyer have been willing to pay a little less than four million dollars for 18 A shares? The two best reasons are either that the buyer hopes to achieve control of the company himself or herself, or hopes to sell to someone else who wants to achieve control of the company.

The first of these two possibilities is less likely. A buyer seeking to control the company has to be in a position to benefit from that control. To benefit significantly from control the buyer would need to hold a significant equity position in the company, through ownership of the B shares. In addition, the buyer could achieve control only by persuading Simplot family members to sell their A shares. This is likely to happen, if at all, in the fairly distant future, and only if the family members believe that the buyer will act in their interests.

The second of the two possibilities is more likely. Simplot Co. is enormously valuable, but owners of B shares cannot easily derive economic advantage from their ownership, because the company has never paid dividends and because B shares are not publicly traded. Because they do not have voting rights, B shareholders have no way to force liquidation of the company and distribution of the proceeds. This means that Simplot family members, or trusts with family members as beneficiaries, need to own a controlling percentage of A shares in order to force the payment of dividends, force liquidation, or take the company public, and thereby realize a return from their ownership of B shares.

None of the siblings individually owns enough A shares to control the company. If the estate's shares were combined with Scott's, however, the owner of the combined shares would own 52.90% and would have control, or if the estate's shares were combined with Don's and Gay's, the owner of the combined shares would own 70.65% of the shares and would have control.

This means that when a willing hypothetical seller and buyer negotiate a price for the A shares, they would do so knowing that members of the Simplot family have economic incentives to pay a large premium for these shares. The hypothetical buyer and seller in our case are therefore in a situation similar to that in *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir.1981). The issue in *Bright* was the value of 27.5% of the voting stock of a

closely held corporation, where the remaining stock was held in similarly sized blocks. The Commissioner in that case argued that because the willing seller and willing buyer both have "reasonable knowledge of relevant facts," Treas. Reg. § 20.2031–1(b), the valuation of the shares should take account of the value that the other owners of sizable blocks of voting stock would place on the shares. The court of appeals was unwilling to entertain this argument because it had not been timely made. *Estate of Bright*, 658 F.2d at 1008. But Judge Rubin, in dissent from his colleagues' unwillingness to entertain the argument, made clear where the argument led. Judge Rubin wrote:

> [The] classic formulation assumes shrewd traders on both sides. Such traders would know that Mr. Bright owned 27.5% of the stock, Mr. Schiff owned 30%, and that the 27.5% available from the willing seller [of the estate's shares] would give control to Bright or to Shiff or could be used to maneuver a course between them.

*Id.* at 1009.

The question then becomes whether Scott, who owns 29.35% of the A shares, would be willing to pay a little less than four million dollars in order to gain voting control of a company worth $830 million, or whether Don and Gay, who together own 47.10% of the A shares, would be willing to pay that amount to gain such control. I believe the answer is clear. Scott, Don, and Gay would each be extremely interested in controlling the A shares, because with control of the A shares they could make decisions—such as issuing dividends or taking the company public—that would be of economic advantage to them and their descendants given their substantial ownership interest of the B shares and their descendants' beneficial ownership of B shares. Scott, Don, and Gay themselves have substantial ownership of B shares, and trusts benefitting

their descendants have much greater ownership of B shares. Once the B share interest is taken into account, the disjunction between voting rights and economic interests disappears with respect to Scott, Don, and Gay. Given these facts, our hypothetical buyer, "maneuvering a course between them," would be able to able to sell 18 A shares for a substantial amount. In my view, that amount probably exceeds the $3.9 million valuation reached by the Tax Court. At the very least, I can find no clear error in the Tax Court's valuation of $3.9 million.

### III

I also find no clear error in the methodology used by the Tax Court. The Tax Court faced a difficult valuation challenge. Traditional studies measure voting premiums on a per-share basis, using data from companies with dual-class stock trading on American stock exchanges. There were grounds for believing that these studies would not be helpful in the present case, given the Simplot Co.'s unusual capital structure in which there were 1,848 B shares for every A share. For example, data from United States stock exchanges is not particularly helpful because the major public exchanges do not allow dramatic imbalances between economic rights and voting rights.

The Tax Court met the challenge by calculating the value of the voting rights premium as a percentage of the equity value of the company, believing that this provided the most realistic measurement of value. A simple voting rights premium, in which the value of one voting share is compared with the value of one non-voting share, would have been problematic, in the Tax Court's view, because the premium would have depended on the ratio between voting and non-voting shares. This ratio, as this case demonstrates, can vary widely

between companies. An equity value premium, by contrast, does not depend on the ratio between voting and non-voting shares.

The Commissioner's experts, relying on a diverse range of studies including some drawing data from non-U.S. markets, offered testimony supporting a voting rights premium for the A shares of between 3% and 10% of the company's equity value. The Tax Court chose the lower-end figure of 3%. This established a voting rights premium for the A shares as a class of about $25 million. The Tax Court took account of the fact that there were restrictions on the ability of a buyer to sell the A shares by applying a marketability discount of 35%. The Tax Court then found that the estate's nearly one-quarter voting interest in an $830 million dollar company was worth $3.9 million. The Tax Court assessed no tax penalty because, in its view, Simplot's estate had reasonably relied on its expert.

The majority believes that the Tax Court's methodology was clearly erroneous because the Tax Court "valued an asset not before it—all the Class A stock representing complete control." Opinion at 6178. I do not believe that this is so. First, the Tax Court relied on expert testimony about the amount of voting rights premiums in comparable circumstances. The Tax Court chose a percentage of equity value, rather than a per-share percentage mark-up, as the means to measure the premium accorded to voting rights. This choice of yardstick, however, did not alter what the Tax Court was measuring. The Tax Court specifically noted that it was only valuing a minority voting interest, and that a control interest would be worth substantially more. Second, the valuation of the A shares as a class was simply one step in determining a per-share value of the A shares, and therefore the value of the 18 A shares owned by the estate.

As I noted above, the Tax Court has broad discretion in choosing its valuation methodology. *See Estate of O'Connell,* 640 F.2d at 251–52. Here, the Tax Court gave a reasoned account of its decision to rely on the findings of two expert witnesses presented by the Commissioner. These witnesses had extensive experience in valuation and presented evidence based on numerous valuation studies. I can find no clear error in the Tax Court's methodology that warrants reversal.

IV

Under the majority's view, there is no fair market value whatsoever for the right to vote the 18 A shares. In its view, one A share is worth precisely the same as one B share. The majority therefore concludes that the fair market value of shares representing 23.5% of the voting shares of a company with sales of $1.8 billion and an equity value of $830 million is only $54,450.

I do not believe that the majority's conclusion comports with economic reality. For someone who owns only A shares, the right to vote does not translate directly into an ability to gain economic benefits from that right. However, for those who own both A shares and B shares—in particular, Scott, Don, and Gay—the right to vote does translate directly into an ability to gain economic benefit. The hypothetical buyer and seller of 18 A shares, reasonably informed of all relevant facts, would be aware of the interests of Scott, Don, and Gay, and would negotiate a price that would reflect them. Given these facts, I believe that the Tax Court's finding that $3.9 million was the value of the 18 A shares, is not clearly erroneous, and I would affirm the Tax Court's decision.