T.C. Memo. 2010-139

UNITED STATES TAX COURT

MULTI-PAK CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21597-08. Filed June 22, 2010.

<u>Kenneth G. Gordon</u>, for petitioner.

<u>Laura J. Mullin</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>: Petitioner petitioned the Court to redetermine the following deficiencies in Federal income taxes and related section 6662(a) accuracy-related penalties:[1]

---

[1]Section references, unless otherwise indicated, are to the applicable versions of the Internal Revenue Code (Code). Rule references are to the Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------|
| 2001 | $123,339 | $24,668 |
| 2002 | 482,325 | 113,095 |
| 2003 | 395,663 | 79,133 |

The first issue for decision is whether petitioner may deduct officer compensation of $2,020,000 and $2,058,000 claimed on its 2002 and 2003 Federal income tax returns, respectively. The 2001 deficiency is a computational adjustment resulting from a net operating loss carryback from 2002 and 2003.[2] Respondent determined in the notice of deficiency that petitioner may deduct only $655,000 and $660,000 for 2002 and 2003, respectively, because petitioner has not shown that any greater amount was reasonable and paid for services. We hold that petitioner may deduct all of the claimed amount for 2002 but only $1,284,104 for 2003. The second issue for decision is whether petitioner is liable for the accuracy-related penalty attributable to taxable (calendar) years 2002 and 2003. We hold petitioner is not.

FINDINGS OF FACT

The parties' stipulation of facts is incorporated herein by this reference, and the facts stipulated are so found. At the time the petition was filed, petitioner maintained its business office in Chatsworth, California. Petitioner filed tax returns on a calendar year basis.

---

[2]For all purposes hereafter, the term "years at issue" refers to 2002 and 2003.

A. Multi-Pak's Business

Petitioner, Multi-Pak Corp. (Multi-Pak, the company, or petitioner) provides a packaging service called flexible wet materials. Customers bring their products to Multi-Pak, which in turn packages them according to the customers' specifications and returns them as finished goods which can then be sold to end users. Multi-Pak constructs all the equipment it uses; it operates as a packaging service primarily for nutritional and pharmaceutical products in the form of pills or capsules.

Multi-Pak was incorporated in 1955 as a C corporation by Ralph Unthank. Upon his death in 1972 his son, Randall Unthank (Mr. Unthank), became the sole shareholder of the company. At the time, Multi-Pak's earnings were down and the company considered filing for bankruptcy protection. Mr. Unthank bought new equipment and attracted new accounts to help prevent the company from filing for bankruptcy.

Mr. Unthank has been Multi-Pak's president, CEO, and COO from 1972 through the years at issue, and he controls all aspects of Multi-Pak's operations.[3] Since 1972 Mr. Unthank has performed all of Multi-Pak's managerial duties and has made all personnel decisions. During the years at issue Mr. Unthank was in charge

---

[3]Mr. Unthank received stock ownership of Multi-Pak after his father passed away in 1972.

of Multi-Pak's price negotiations, product design, machine design and functionality, and administration.

B.   Multi-Pak's Financial Condition

For 2000 through 2003 petitioner's total assets; revenue; earnings before interest, taxes, depreciation, and amortization (EBITDA); net income; and total equity were as follows:

|              | 2000 | 2001 | 2002 | 2003 |
|--------------|------|------|------|------|
| Total assets | $2,714,100 | $3,166,800 | $3,320,900 | $3,134,000 |
| Revenue | 5,929,500 | 7,947,300 | 9,483,800 | 8,770,900 |
| EBITDA | 92,200 | 449,600 | 508,500 | (120,500) |
| Net income | 24,600 | 246,800 | 140,700 | (474,000) |
| Total equity | 2,522,000 | 2,792,000 | 3,181,300 | 2,994,200 |

For 2002 and 2003, petitioner paid its payables currently and was essentially debt free.

C.   Multi-Pak's Employee Compensation

Mr. Unthank's salary and bonuses for 1996 through 2003 were as follows:

| Year | Salary | Bonus | Total |
|------|--------|-------|-------|
| 1996 | $150,000 | $96,000 | $246,000 |
| 1997 | 150,000 | 464,000 | 614,000 |
| 1998 | 150,000 | 712,000 | 862,000 |
| 1999 | 150,000 | 1,063,398 | 1,213,398 |
| 2000 | 150,000 | 988,900 | 1,138,900 |
| 2001 | 150,000 | 1,086,000 | 1,236,000 |
| 2002 | 150,000 | 1,870,000 | 2,020,000 |
| 2003 | 353,000 | 1,705,000 | 2,058,000 |

From 1996 to 2000 Mr. Unthank's total compensation was based in part on annual sales.  Although he received a flat salary, his bonus varied year to year depending on sales and performance.

Petitioner deducted the compensation paid to Mr. Unthank as officer compensation on its Forms 1120, U.S. Corporation Income Tax Return. In 2001 petitioner's business improved, and sales and revenue increased by 20 percent over the year 2000.

In 2002 and 2003 petitioner employed approximately 100 employees who were paid hourly. Petitioner also employed three sons of Mr. Unthank, who were executives and were each paid a base salary and a monthly bonus.

Mr. Unthank's sons' compensation for the years 2002 and 2003 was as follows:

|       | 2002      |           | 2003      |           |
|       | Salary    | Bonus     | Salary    | Bonus     |
|-------|-----------|-----------|-----------|-----------|
| Erik  | $100,000  | $465,000  | $102,000  | $330,000  |
| Darin | 80,000    | 425,000   | 81,000    | 295,000   |
| Alan  | 60,000    | 270,000   | 61,000    | 235,000   |

The deductibility of the compensation paid to his sons is not an issue in this case.[4]

At trial Mr. Unthank testified that he decided the amounts of bonuses for himself and his sons at the end of every month. He would decide the amounts on the basis of his and his sons' performance during the month and on the profitability of the company.

---

[4]Respondent did not call the sons as witnesses or seek to introduce evidence of their services.

D.  Nu-Skin

In 1996 petitioner acquired a new client, Nu-Skin Corp. (Nu-Skin), a producer of skin-care products.  Nu-Skin's business needs caused an increase in petitioner's revenue from 1996 to 2000.  During 2001 Nu-Skin informed Multi-Pak that it anticipated a need to increase its packaging requirements.  To meet Nu-Skin's needs, Multi-Pak rebuilt a packaging machine that was capable of producing, before it was rebuilt, 4 packages per cycle at a rate of 80 cycles per minute (a total capacity of 320 packages per minute).  After the extensive retooling, the machine's capacity was nearly doubled to 6 packages per cycle at 100 cycles per minute (or a total capacity of 600 packages per minute).

The packaging requirements for Nu-Skin's international markets increased approximately 30 percent between 2001 and 2002. The retooling efforts allowed Multi-Pak to meet Nu-Skin's increased demand without requiring Nu-Skin to find additional packaging vendors.

Petitioner's regular production schedule consisted of four 10-hour days for 51 weeks in each calendar year.  The production hours were extended in 2002 and 2003 to 56-plus hours per week to accommodate customer needs, particularly those of Nu-Skin.

E.  Expansion of Multi-Pak's Office and Warehouse

From 1991 through 2000 Multi-Pak's manufacturing operations, inventory, storage facilities, and corporate headquarters were

maintained in a 17,000-square-foot facility in Chatsworth, California, purchased by Mr. Unthank and leased to the company at market rates.  In 2000 Multi-Pak began leasing a portion of a 35,000-square-foot adjoining building for storage.  This building became available for purchase in October 2001 and was acquired by a partnership owned by the Unthank family and was leased in its entirety to Multi-Pak, nearly tripling Multi-Pak's space.

The building acquired by Mr. Unthank for Multi-Pak's use was not initially suitable for Multi-Pak's packaging operations and did not conform to the Food and Drug Administration's (FDA's) standards for Good Manufacturing Practices (GMP).  During the first half of 2002, the building was extensively redesigned, upgraded, and renovated to meet Multi-Pak's and the FDA's requirements.  The renovations included:  (1) Developing a flow pattern for receiving, storing, packaging, inspecting, and shipping the finished goods to customers; (2) partitioning the plant into different packaging rooms to prevent contamination and product mixup; (3) designing gowning areas and "air/vacuum" showers to further prevent contamination; (4) determining and designing the heating and cooling loads and electrical requirements and distribution in the various packaging rooms; and (5) developing a compressed air system to serve the needs of the packaging machinery throughout the plant.  Mr. Unthank was

directly and significantly involved in all phases of the design and renovation of the facility.

On February 1, 2003, petitioner timely filed a Form 1120 for 2002 and reported $2,020,000 of compensation to Mr. Unthank. On February 10, 2004, petitioner timely filed a Form 1120 for 2003 and reported $2,058,000 of compensation to Mr. Unthank. Scott Brown (Mr. Brown) prepared Multi-Pak's Forms 1120 for 2000, 2001, 2002, and 2003. Mr. Brown is a certified public accountant at Roger A. Brown & Co. (Brown & Co.), which has been preparing petitioner's tax returns since 1965. Mr. Brown advised Mr. Unthank and Multi-Pak on their compensation regularly. Mr. Brown and his firm evaluated Mr. Unthank's compensation and determined it was reasonable for the years at issue.

Mr. Brown provided to the Court a written analysis of petitioner's finances as follows:

|  | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Net income | $31,684 | $370,183 | $140,651 | ($474,124) |
| Interest | -0- | 210 | 137 | 349 |
| Taxes--Federal | 7,044 | 123,339 | 47,649 | -0- |
| Taxes--California | 2,553 | 34,529 | 41,489 | 800 |
| Depreciation | 61,336 | 79,842 | 367,686 | 353,235 |
| Depreciation--Schedule A | 240,140 | 226,229 | 247,242 | 275,426 |
| Amortization | -0- | -0- | -0- | -0- |
| EBITDA | 342,757 | 834,332 | 844,854 | 155,686 |
| Total equity | 2,522,024 | 2,791,979 | 3,229,065 | 2,994,232 |
| Return on equity | 13.6% | 29.9% | 26.2% | 5.2% |

On June 19, 2008, respondent issued to petitioner a notice of deficiency disallowing a portion of the deduction it claimed for compensation paid to Mr. Unthank for each of the years 2002 and 2003. Petitioner timely filed its petition on September 2,

2008.  A trial was held on September 15, 2009, in Los Angeles, California.

## OPINION

### I.  Reasonable Compensation

Section 162(a)(1) permits a taxpayer to deduct ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered".  A taxpayer is entitled to a deduction for compensation if the payments were reasonable in amount and in fact paid purely for services.  Sec. 1.162-7(a), Income Tax Regs.  Although framed as a two-prong test, the inquiry under section 162(a)(1) generally turns on whether the amounts of the purported compensation payments were reasonable.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1245 (9th Cir. 1983), revg. T.C. Memo. 1980-282.

Petitioner has the burden of proving that the payments to Mr. Unthank were reasonable.  See Rule 142(a).  Petitioner contends the amounts paid to its president and CEO, Mr. Unthank, in the years at issue constituted reasonable compensation under section 162(a)(1).  Conversely, respondent contends Mr. Unthank's compensation for the years at issue was unreasonable.  The Court of Appeals for the Ninth Circuit, to which an appeal in this case would normally lie, has addressed the issue of burden of proof in estate tax valuation cases in a series of three decisions.

Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), affg. in part, vacating in part and remanding 103 T.C. 520 (1994) and T.C. Memo. 1997-461; Estate of Simplot v. Commissioner, 249 F.3d 1191 (9th Cir. 2001), revg. and remanding 112 T.C. 130 (1999); Morrissey v. Commissioner, 243 F.3d 1145 (9th Cir. 2001), revg. and remanding Estate of Kaufman v. Commissioner, T.C. Memo. 1999-119. In each of these cases the Commissioner determined an estate tax deficiency based upon an increase in the fair market value, over that claimed on the tax return, of shares in a closely held corporation. Estate of Mitchell v. Commissioner, supra at 698-699; Estate of Simplot v. Commissioner, supra at 1193; Morrissey v. Commissioner, supra at 1147. Subsequently, the Commissioner submitted expert reports supporting his concessions that the value of the subject stock was less than that determined in the statutory notice. Estate of Mitchell v. Commissioner, supra at 702; Estate of Simplot v. Commissioner, supra at 1193-1194; Morrissey v. Commissioner, supra at 1147.

Confronting this scenario, the Court of Appeals in each instance indicated that the Commissioner's adoption of a litigation posture deviating from the valuation stated in the notice of deficiency resulted in a forfeiture of any presumption of correctness and placed the burden of proof on the Commissioner. Estate of Mitchell v. Commissioner, supra at 702; Estate of Simplot v. Commissioner, supra at 1193; Morrissey v.

Commissioner, supra at 1148-1149.  Under the rule of Golsen v.
Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th
Cir. 1971), this Court will follow a Court of Appeals decision
which is squarely in point where appeal from our decision lies to
that Court of Appeals.

The notice of deficiency issued to petitioner determined Mr.
Unthank's reasonable compensation to be $655,000 and $660,000 for
2002 and 2003, respectively.  Respondent's expert report and
posttrial briefs valued the reasonable compensation at $1,461,000
for 2002 and $670,100 for 2003.  Nonetheless, the record in this
case is such that our conclusion would be the same regardless of
the burden of proof.  We therefore shall base our ruling on the
preponderance of the evidence.

The Court of Appeals uses five factors to determine the
reasonableness of compensation, with no single factor being
determinative.  Elliotts, Inc. v. Commissioner, supra at 1245.
The parties agree that we should apply the factors in Elliotts,
Inc.  The factors are:  (1) The employee's role in the company;
(2) comparison with other companies; (3) the character and
condition of the company; (4) potential conflicts of interest;
and (5) internal consistency in compensation.  Id. at 1245-1248.
When officers who control the corporation set their own
compensation, careful scrutiny is necessary to determine whether
the alleged compensation is in fact a distribution of profits and

a constructive dividend.  <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1156 (1980).

II.  <u>Applying the Elliotts Factors</u>

We will apply each factor in turn.

A.    <u>Role in the Company</u>

This factor focuses on the employee's importance to the success of the business.  Pertinent considerations include the employee's position, hours worked, and duties performed. <u>Elliotts, Inc. v. Commissioner</u>, <u>supra</u> at 1245.

During the years at issue Mr. Unthank was the sole shareholder, president, CEO, and COO of Multi-Pak.  Among the services he performed were:  (1) Engineering services; (2) functioning as a draftsman; (3) designing machines; (4) negotiating contracts; (5) ordering equipment; (6) making financial arrangements to acquire products; (7) acquiring inventory; (8) making payments on payables; (9) functioning as a troubleshooter in the operation of the machines and business overall; (10) developing new accounts; (11) making policy decisions concerning operations and customer development, and (12) determining the product liability insurance coverage and risk management.

In 2002 Mr. Unthank reconfigured the new warehouse facility to accommodate petitioner's operations and meet FDA regulations, drafted floor plans for the adjoining building, determined

electrical distribution for each room, determined the compressed air filtration system for each room, helped design the lighting system, and designed the warehouse layout and flow pattern.

Mr. Unthank made every important decision for petitioner's operations during the years at issue. His devoting all of his time to petitioner's operations directly contributed to its financial condition. This factor weighs in petitioner's favor.

B. External Comparison

This factor compares the employee's compensation with that paid by similar companies for similar services. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; see sec. 1.162-7(b)(3), Income Tax Regs. Expert witness testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment. See Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989). Courts often use expert witness opinions to evaluate the reasonableness of compensation. Nonetheless, the Court is not bound by an expert's opinion and we may either accept or reject expert testimony in the exercise of sound judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. Furthermore, the Court may be selective in determining what portions of an expert's opinion, if any, to accept. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Both parties introduced expert witness reports in support of

their respective positions, and these reports relate to our analysis of comparable salaries.

### 1. Petitioner's Expert

Petitioner presented the expert testimony of Kevin J. Murphy (Professor Murphy), an adviser to the Special Master of executive compensation for the Department of the Treasury and a professor of economics and law at the University of Southern California. Professor Murphy, in reaching his conclusion that petitioner's compensation was reasonable, focused on two inquiries: First, whether the payments Mr. Unthank received were reasonable relative to payments received by similarly situated executives in similarly situated firms (competitive pay analysis); and second, whether the payments Mr. Unthank received were commensurate with his services rendered.

### (a) Competitive Pay Analysis

Professor Murphy's competitive pay analysis reflected his belief that the skills and abilities necessary to lead Multi-Pak are similar to the skills and abilities necessary to lead firms in a variety of light manufacturing, engineering, and business service industries. The competitive pay analysis compared Mr. Unthank's compensation with the average compensation received by CEOs in the S & P SmallCap 600 (defined as small capitalization firms excluding financial services and utilities) from 1993 to 2003. The data is derived from S & P's "ExecuComp" database,

which includes detailed executive compensation information extracted from corporate proxy statements and 10-K statements for companies in the S & P 500, S & P MidCap 400, and S & P SmallCap 600. Professor Murphy presented a regression model which allowed him to compare Multi-Pak with the SmallCap 600 firms on a size-adjusted basis. The median SmallCap 600 firms had revenues in 2003 of $510 million, which was roughly $501 million more than Multi-Pak. Many firms in the SmallCap 600 paid their CEOs through salary, bonuses, and stock options or restricted stock grants while Mr. Unthank was paid from salary and bonuses.

For the years 2002 and 2003, after adjusting for petitioner's size in relation to the size of the companies in the comparison group, Mr. Unthank's salary and bonuses were at the very top of the scale when compared with the salary and bonuses received by CEOs of those companies and was in the 94th or 95th percentile when compared with those CEOs' total pay (including grants to them of stock options and of restricted stock). If no adjustment is made for the relative size of the companies, Mr. Unthank's salary and bonuses were at the 95th and 97th percentiles in relation to the salary and bonuses received by CEOs in the comparison group in 2002 and 2003, respectively, and were in the 67th and 68th percentiles, respectively, when compared with those CEOs' total pay. Mr. Unthank's 2002 and 2003 total compensation approximated the average total compensation

received by SmallCap 600 CEOs but significantly exceeded the average salary and bonus received by these executives.

Professor Murphy concluded that the payments Mr. Unthank received in 2002 and 2003 are within a range of reasonable compensation.  He stated that although Mr. Unthank was highly paid, there was nothing inappropriate or unreasonable per se in paying an executive in the 95th percentile of total compensation on a size-adjusted basis.

### (b)  Assessment of Services Rendered

Professor Murphy claimed that the 61-percent increase in Multi-Pak's revenues from 2000 to 2002 was in large part due to Mr. Unthank and, as a result thereof, Mr. Unthank's 75-percent increase in compensation from 2001 to 2003 was not unreasonable. According to Professor Murphy, the revenue increased because of the extensive retooling/rebuilding of the packaging machine made necessary by Nu-Skin and because of the acquisition of the second production facility.  In his expert report, Professor Murphy stated that it was routine to give bonuses based on cumulative performance over the past 3 to 5 years and that Mr. Unthank accordingly received bonuses in 2002 and 2003 when the increase in sales and revenue was realized from the acquisition of the building and the increase in business from Nu-Skin.

In Professor Murphy's opinion, even though petitioner's sales dropped in 2003, it is not unusual for a corporation to pay

discretionary bonuses in a period when sales are in decline if it is determined that the decline is not the fault of the executive. An example would be bonuses paid when, by reason of a bad economy, sales dropped. In addition, Professor Murphy did not find any evidence that petitioner paid bonuses to Mr. Unthank for the purpose of absorbing taxable profit.

### 2. Respondent's Expert

Respondent presented expert testimony from David Fuller (Mr. Fuller), an expert in the area of compensation. Mr. Fuller is president of Valve, Inc., a financial consulting firm. Mr. Fuller has been a valuation consultant for financial and tax reporting purposes for 20 years. Mr. Fuller opined that reasonable levels of compensation for Mr. Unthank would have been $1,461,300 for 2002 and $670,100 for 2003.

Mr. Fuller analyzed whether an independent investor would be satisfied with his or her return on an investment in petitioner after Mr. Unthank's compensation. Mr. Fuller conducted the independent investor test under three distinct scenarios.

In the first scenario Mr. Fuller used eight publicly traded companies that he said were as similar as possible to Multi-Pak in terms of products, dynamics, and services. The eight publicly traded companies were listed as follows:

|  | Total Assets | Revenue | EBITDA | Net Income | Total Equity |
|---|---|---|---|---|---|
| AEP Ind. | $469,000,000 | $660,600,000 | $47,900,000 | ($1,800,000) | $61,600,000 |
| BEMIS Co. | 2,256,700,000 | 2,369,000,000 | 401,400,000 | 165,500,000 | 959,000,000 |
| CCL Ind. | 852,000,000 | 1,073,000,000 | 117,200,000 | 13,800,000 | 277,300,000 |
| Chesapeake | 1,352,900,000 | 822,200,000 | 112,400,000 | 21,900,000 | 476,600,000 |
| Graphic Packaging | 1,957,700,000 | 1,247,300,000 | 273,900,000 | (11,200,000) | 132,500,000 |
| Pactiv Corp. | 3,412,000,000 | 2,880,000,000 | 617,000,000 | 148,000,000 | 897,000,000 |
| Sealed Air Corp. | 4,260,800,000 | 3,204,300,000 | 680,000,000 | (309,100,000) | 813,000,000 |
| Sonoco Products | 2,436,400,000 | 2,701,400,000 | 405,300,000 | 135,300,000 | 867,400,000 |

In this scenario Mr. Fuller's objective was to establish the reasonable amount of compensation to Mr. Unthank from the standpoint of an independent investor who owned the company throughout the years 2002 and 2003. To do this, he estimated the appropriate rate of return by observing pretax rates of return on equity for the publicly traded companies identified above. He started with Multi-Pak's book value of equity and multiplied that by the pretax rates of the public companies, producing a dollar value of return that an independent investor would require for each year. He then subtracted that value from Multi-Pak's earnings before interest or taxes. He opined that the difference was the value of reasonable shareholder compensation. Scenario 1 resulted in estimated values of $1,462,000 and $1,030,600, for 2002 and 2003, respectively.

In the second scenario, Mr. Fuller undertook to estimate the amount of compensation to Mr. Unthank that would be reasonable from the standpoint of an independent investor who purchased the company on December 31, 2001 or 2002. Mr. Fuller looked at the Pratt Stats database, a national database that publishes information relating to business valuations, to find purchases of

companies similar to Multi-Pak.  Mr. Fuller then estimated a reasonable rate of return by observing rates of return based on EBITDA (earnings before interest, taxes, depreciation, and amortization) as a percentage of the market value of invested capital for the similar companies.  He then subtracted that rate of return from Multi-Pak's EBITDA rate of return on equity before deductions for shareholder compensation and taxes.  The remaining amount after accounting for depreciation was then estimated to be the indicated value of reasonable shareholder compensation.  The concluded levels for scenario 2 were $1,301,900 and $585,100 for 2002 and 2003, respectively.

In the third scenario, as in the second, Mr. Fuller sought to estimate the amount of compensation to Mr. Unthank that would be reasonable from the perspective of an independent investor who had purchased the company on December 31, 2001 or 2002.  But here Mr. Fuller tried to estimate the appropriate rate of return through the use of the buildup method.  The buildup method determines a reasonable rate of return on an investment based on the expected return on assets with similar risk exposure.  Mr. Fuller then subtracted the rate of return, as so determined, from Multi-Pak's rate of return on equity before interest and taxes and before deductions for shareholder compensation.  The remaining amount was then estimated to be the indicated value of reasonable shareholder compensation.  The concluded levels for

scenario 3 were $1,180,600 and $394,600 for 2002 and 2003, respectively.

Mr. Fuller reached an opinion as to reasonable compensation based on each of his three scenarios and then averaged the three conclusions, giving each equal weight, to come to his final conclusion. Mr. Fuller's report concluded that as a percentage of revenue, the 2002 compensation levels were 18.4 percent, 16.4 percent, and 14.9 percent for scenarios 1, 2, and 3, respectively, with an arithmetic average of 16.5 percent. The 2003 compensation levels were 10.9 percent, 6.2 percent, and 4.2 percent in scenarios 1, 2, and 3, respectively, with an arithmetic average of 7.1 percent.

Mr. Fuller increased his estimate of reasonable compensation for Mr. Unthank for 2002 to include an allowance of $146,500 for working double shifts for a quarter of the year as an engineer, and to compensate Mr. Unthank for the retooling efforts in 2001. Mr. Fuller reached this number using the Zweig White survey, which Mr. Fuller testified was used to observe reported compensation levels for principals, partners, and owners of multidiscipline engineering firms. According to the Zweig White survey, the upper quartile annual compensation amount for principals, partners, and owners of such companies in the Pacific region was $293,000. Mr. Fuller then divided $293,000 by 2 and gave $146,500 to Mr. Unthank as an added amount for the extra

work he put in for the retooling effort in 2001. Mr. Fuller opined that reasonable levels of compensation for Mr. Unthank would have been $1,461,300 for 2002 and $670,100 for 2003. According to Mr. Fuller, these amounts would properly compensate Mr. Unthank for his efforts in the retooling process.

### 3. Conclusion

We do not find the opinion of either party's expert completely convincing. Neither expert's comparables were similar to petitioner. Petitioner's expert selected the S & P SmallCap 600 as a comparison to petitioner, while respondent's expert selected eight publicly traded companies that he deemed similar. The S & P SmallCap 600 includes companies from different sectors of the market that on average have revenues 58 times greater than petitioner's while the eight publicly traded companies that respondent's expert deemed similar had revenues on average 200 times higher than petitioner's. Although Mr. Fuller testified that he adjusted his analysis to account for this size difference, he did not explain how. Mr. Fuller acknowledged that there are few companies that are actually comparable to petitioner and therefore doing an external executive compensation comparison is difficult. Thus, Mr. Fuller's analysis of the "amount as would ordinarily be paid for like services by like enterprises under like circumstances" is not definitive. See sec. 1.162-7(b)(3), Income Tax Regs.

Mr. Fuller based his conclusion on an analysis of whether an independent investor would be satisfied with his or her return on an investment in petitioner after Mr. Unthank's compensation. In his first scenario, Mr. Fuller selected eight companies in the packaging industry and compared each company's CEO's compensation to that of Mr. Unthank. At trial Mr. Fuller testified, however, that it would be a "mischaracterization" to believe he picked these eight as the companies most reasonably comparable to petitioner. In fact, Mr. Fuller stated that he did not select these eight companies for purposes of determining compensation but to determine what return on equity an independent investor would expect from an investment in a healthy company in the packaging industry.

Petitioner was virtually debt free and had few liabilities on its balance sheet. But the average debt-equity ratio of the eight companies that Mr. Fuller selected was 7 to 3 for both years in question. Equity in a firm with such debt is inherently riskier than equity in a firm without as much debt, and thus shareholders will demand a higher rate of return on equity in the former firm. "The riskier the venture the greater the rate of return necessary to compensate for that risk." Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. without published opinion 937 F.2d 612 (9th Cir. 1991). "The greater the percentage of debt, the riskier that company will be as an investment (all

other things being equal), and the greater the rate of return will have to be in order to attract investors." Celebrity Cruises, Inc. v. Essef Corp., 478 F. Supp. 2d 440, 452 (S.D.N.Y. 2007).

Additionally, Mr. Fuller stated that he gave Mr. Unthank an allowance of $146,500 for working double shifts for one quarter in 2001 as an engineer and to compensate Mr. Unthank for the retooling efforts. Mr. Fuller testified that the Zweig White survey is used in his practice for reasonable compensation cases concerning engineering firms. We fail to see how this survey is relevant to petitioner's operations. First, petitioner is not an engineering firm. Second, Mr. Unthank's role in the company was not only that of an engineer but also that of a designer and developer who oversaw the decision to retool and managed the retooling process while structuring the company's contracts. Because Mr. Fuller's analysis was based on dissimilar companies and because Mr. Unthank was not just an engineer on the retooling project, we disagree with respondent's expert testimony.

We now turn to petitioner's expert, Professor Murphy. In estimating whether Mr. Unthank's compensation was reasonable, Professor Murphy did not perform the analysis, required in the applicable caselaw, of whether an independent investor would have been satisfied by his or her return on investment. In addition, Professor Murphy's only point of comparison was the S & P

SmallCap 600.  The median 2003 revenue for the S & P SmallCap 600 is $510 million, which is significantly higher than petitioner's revenue of $8.77 million in 2003.  Also, the S & P SmallCap 600 is not an index that focuses on companies similar in business to petitioner.  The S & P SmallCap 600 has businesses in the energy, health care, and technology sectors.  Although Professor Murphy's report, unlike Mr. Fuller's, made adjustments in an attempt to account for the difference between petitioner's revenues and those of the companies selected as comparables, Professor Murphy's report lacked an independent investor test and his companies were too dissimilar to provide a comparison to petitioner.

In summary, we have not found the analyses performed or the opinions expressed by either of the parties' experts to be persuasive or reliable.  Therefore, we find that the comparison to the compensation paid by unrelated firms is a neutral factor.

C.   Character and Condition of the Company

This factor focuses on petitioner's size as measured by its sales, net income, or capital value; the complexities of the business; and general economic conditions.  See Elliotts, Inc. v. Commissioner, 716 F.2d at 1246.

Petitioner is prominent in the industry of packaging vitamins, pills, and other small items in the Western United

States.  While petitioner's revenue increased from 2001 to 2002, they declined from 2002 to 2003.  Despite the decrease in 2003, revenue remained almost 50 percent higher than in 2000, before the major retooling efforts in 2001.  Equity, revenue, and gross profit in 2002 and 2003 were petitioner's highest.  However, petitioner's net income remained low even though revenues had increased.  For the years in issue, net income after taxes was $93,000 and negative $474,000, respectively.[5]

Petitioner's business was complex.  It involved purchasing a new warehouse in 2001, remodeling it, adding new machines, and hiring additional workers.  In addition, petitioner's ability to quickly respond to the increased production demands in 2001 of Nu-Skin, its major customer, by increasing hours and purchasing more warehouse space contributed significantly to its rise in total sales in 2002 and 2003.  The acquisition of the adjoining building in October 2001 added 35,000 square feet, more than tripling petitioner's plant capacity, starting in 2002 and continuing in subsequent years.  Petitioner did this work while assuming no debt during the years at issue, and thus the company had very small liabilities on its balance sheet.

Although petitioner's net income in 2002 and 2003 was low when compared to revenues, other factors such as equity, revenue,

---

[5]Petitioner had total tax liabilities of $47,600 and $0 in 2002 and 2003, respectively.

and gross profit point towards a successful operation. Neither party presented direct evidence by which we can definitively compare petitioner's operations with those of similar businesses. However, the evidence does suggest that petitioner was one of the more successful companies of its kind. Accordingly, we find that this factor favors petitioner.

D. Conflict of Interest

This factor examines whether a relationship exists between the company and the employee which would permit the company to disguise nondeductible corporate distributions as section 162(a)(1) compensation payments. Close scrutiny may be used when the paying corporation is controlled by the compensated employee, as in the instant case. Elliotts, Inc. v. Commissioner, supra at 1246-1247. However, the mere fact that the individual whose compensation is under scrutiny is the sole shareholder of the company, even when coupled with an absence of dividend payments, "does not necessarily lead to the conclusion that the amount of compensation is unreasonably high". Id. at 1246. There is no question in this case that Mr. Unthank, as the sole shareholder, president, and CEO occupied a position deserving scrutiny.

The Court of Appeals for the Ninth Circuit has held that the reasonableness of compensation should be evaluated from the perspective of a hypothetical independent investor. Under the independent investor test, a company's annual return on equity

usually begins with a company's net income after taxes for that year. Dexsil Corp. v. Commissioner, 147 F.3d 96, 99 (2d Cir. 1998), vacating T.C. Memo. 1995-135; Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343, affd. 221 F.3d 1091 (9th Cir. 2000). If the company's earnings on equity after payment of the compensation at issue remain at a level that would satisfy a hypothetical independent investor, there is a strong indication that the employee is providing compensable services and that profits are not being siphoned out of the company disguised as salary. Elliotts, Inc. v. Commissioner, supra at 1247. The Court of Appeals in Elliotts, Inc. calculated the return on equity using the yearend shareholders' equity. Id.

Petitioner's accountant, Mr. Brown, calculated petitioner's return on equity to be 26.2 percent and 5.2 percent for 2002 and 2003, respectively. In those computations Mr. Brown added back interest, taxes, and depreciation into his estimation of petitioner's net income. Respondent's expert, Mr. Fuller, calculated the return on equity to be 4.4 percent and -15.8 percent for 2002 and 2003, respectively. Mr. Fuller did not add back interest, taxes, and depreciation into his calculation.

Dividing petitioner's net profit (after payment of compensation and a provision for income taxes) by the yearend shareholder's equity as reflected in its financial statements yields return on equity of 2.9 percent and -15.8 percent in 2002

and 2003, respectively.  See <u>John L. Ginger Masonry, Inc. v.</u>
<u>Commissioner</u>, T.C. Memo. 1997-251.

In <u>Elliotts, Inc. v. Commissioner</u>, <u>supra</u> at 1247, the Court
of Appeals found that a 20-percent average rate of return on
equity would satisfy a hypothetical independent investor.  But
the Court of Appeals also stated that there could be a situation
in which a corporation might suffer a loss or an inadequate
return on equity yet compensation paid to employees is
reasonable.  "[A] formula should reasonably compensate for the
work done, the performance achieved, the responsibility assumed,
and the experience and dedication of the employee."  <u>Id.</u> at 1248.

Petitioner became the president of Multi-Pak in 1973 when it
was near bankruptcy and has since helped to bring it financial
stability.  During the years in issue, its sales were at or near
all-time highs and it had little or no debt.  Mr. Unthank was
present during all client negotiations and managed the redesign
and expansion of the corporation to triple its original size.  He
has been the active president, CEO, and COO for all years at
issue.  Though an independent investor may prefer to see higher
rates of return, we believe an independent investor would note
that Mr. Unthank was the sole reason for this company's
significant rise in sales in 2002 due to his agreement with Nu-
Skin and the subsequent expansion of the company.  Mr. Unthank

made every important decision for petitioner and had the most important role in increasing its sales and limiting its debt.

However, we agree with respondent that a negative 15.8-percent return on equity in 2003 calls into question the level of Mr. Unthank's compensation for that year. When compensation results in a negative return on shareholder equity, we cannot conclude, in the absence of a mitigating circumstance, that an independent investor would be pleased. Donald Palmer Co. v. Commissioner, T.C. Memo. 1995-65, affd. without published opinion 84 F.3d 431 (5th Cir. 1996).

We find this factor to favor petitioner in 2002 and respondent in 2003.

E.    Internal Consistency of Compensation

Finally, evidence of an internal inconsistency in a company's treatment of payments to employees may indicate that the payments go beyond reasonable compensation. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. "Bonuses that have not been awarded under a structured, formal, consistently applied program generally are suspect * * * On the other hand, evidence of a reasonable, longstanding, consistently applied compensation plan is evidence that the compensation paid in the years in question was reasonable." Id. The bonus should not be decided after perusing the year's profits. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200.

Payment of bonuses at yearend when the corporation knows its revenue for that year may enable it to disguise dividends as compensation. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Estate of Wallace v. Commissioner, 95 T.C. 525, 556 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).

In Vitamin Vill., Inc. v. Commissioner, T.C. Memo. 2007-272, this Court found that the bonuses paid were not awarded under a structured, formal, or consistently applied program but were paid under the taxpayer's plan to award a bonus for present hard work and prior years' lack of compensation when the taxpayer became more profitable. Generally, incentive compensation plans are designed to increase the compensation to employees by some fraction of the benefit the corporation derives from the employee's efforts. See Elliotts, Inc. v. Commissioner, supra at 1248 (stating that "Incentive payment plans are designed to encourage and compensate that extra effort and dedication which can be so valuable to a corporation.").

Petitioner argues that the record shows a reasonable and relatively consistently applied compensation schedule that was based on the employees' monthly productivity. After Mr. Unthank took over in 1972, petitioner paid Mr. Unthank a monthly bonus dependent on petitioner's performance and profits for that month. Mr. Unthank testified that there was no established monthly

amount but that he determined at the end of each month the amount he and his sons received on the basis of performances. In 2002 and 2003 Mr. Unthank paid himself a monthly bonus of $100,000 to $250,000 in 19 of the 24 months. In four other instances, Mr. Unthank paid himself a bonus of $50,000 or less; and in another, he paid himself about $375,000. In addition, Mr. Unthank's sons, Alan, Darin, and Erik, each had monthly bonuses that ranged from zero to $90,000.

Petitioner awarded bonuses every month based on both Mr. Unthank's and his sons' performances. This Court has previously found that a taxpayer's payment of bonuses throughout the year and the declaration of the amount at the end of the year does not indicate unreasonableness. Escrow Connection, Inc. v. Commissioner, T.C. Memo. 1997-17. The fact that the recipient is a shareholder-employee does not make the plan unreasonable. Elliotts, Inc. v. Commissioner, supra at 1248.

Accordingly, we find that petitioner's treatment of Mr. Unthank's bonuses was under a consistent business policy.

F. Conclusion

Mr. Unthank, as petitioner's sole executive officer and president, was the driving force behind petitioner's success. His dedication and hard work resulted in the company's record sales for the years at issue. When revenues and sales rose in 2002, almost all of the rise could be attributed to Mr. Unthank.

We believe that an independent investor would accept a 2.9-percent return on equity for 2002 in the light of the roughly $3 million growth in sales from 2000 and the long-term potential of the company. We find that petitioner's compensation paid was reasonable for that year.

In 2003 Multi-Pak saw a drop in sales and revenue, but petitioner still gave Mr. Unthank more compensation than he had received in 2002. Even though the 2003 revenue and equity numbers were the second highest in petitioner's history, return on equity in 2003 was -15.8 percent, an amount which would not be acceptable for an independent investor. Mr. Unthank's total compensation from 1999 to 2001 averaged $1,196,099. For 2002 we have found that an independent investor would have been willing to accept a 2.9-percent return on equity in the light of the impressive sales growth of the business. Accordingly, with a drop in sales in 2003, an independent investor would expect lower compensation. If Mr. Unthank's salary is reduced to $1,284,104 in 2003, the return on equity for petitioner rises to 10 percent in 2003. We believe this would be sufficient given the overall character of the company. The Court therefore finds that petitioner is entitled to deduct $2,020,000 and $1,284,104 in 2002 and 2003, respectively, under section 162(a)(1).

III.  Accuracy-Related Penalty for 2002 and 2003

Respondent determined that petitioner was liable for accuracy-related penalties under section 6662(a) for negligence or intentional disregard of rules and regulations for tax years 2002 and 2003.  Petitioner argues that it is not liable for these penalties because it relied reasonably on its accountant's advice in preparing its returns.  We have found that petitioner's 2002 compensation to Mr. Unthank was proper.  Consequently, there is no underpayment of tax for 2002 on which the accuracy-related penalty under section 6662(a) may be imposed.

As relevant herein, section 6662(a) and (b)(1) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations.  Negligence includes a failure to attempt reasonably to comply with the Code, whereas disregard includes a careless, reckless, or intentional disregard.  Sec. 6662(c).

A section 6662(a) accuracy-related penalty shall not be imposed to the extent that the taxpayer shows that an underpayment is due to the taxpayer's having reasonable cause and acting in good faith.  Sec. 6664(c); secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.  Reasonable cause requires that the taxpayer exercise ordinary business care and prudence as to the disputed item.  United States v. Boyle, 469 U.S. 241 (1985).  A

good-faith reasonable reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. Id. at 250; sec. 1.6664-4(b)(1), Income Tax Regs. Whether a taxpayer relies on professional advice and whether such reliance is reasonable hinge on the facts and circumstances of the case and the law that applies to those facts and circumstances. Sec. 1.6664-4(c)(1), Income Tax Regs.

For a taxpayer to rely reasonably upon professional advice to negate a section 6662(a) accuracy-related penalty, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Rule 142(a)(2).

The record convinces us that petitioner has met each of these requirements for 2003. We do not find anything in the record that causes us to believe that Mr. Brown was not a competent professional with sufficient expertise to justify reliance. Mr. Brown testified that Mr. Unthank would call him with the bonus amounts and that Brown & Co. made a decision on reasonableness at the end of the year. Because petitioner

actually relied in good faith on its accountant's advice as to the matters at hand and the reliance was reasonable, we decline to sustain respondent's determination as to the accuracy-related penalty for 2003.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.